Filed 1/27/16  P. v. Mendoza CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NANCY MICHELLE MENDOZA MORENO,<br><br>    Defendant and Appellant. | D064526<br><br><br><br>  (Super. Ct. No. SCD208828<br>   Super. Ct. No. SCD236102) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Einhorn, Judge.  Affirmed and remanded with directions.

David L. Polsky, under appointment by the Court of Appeal; Elizabeth E. Comeau and Charles R. Khoury, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

This case arose out of two kidnappings perpetrated in 2007 by members of the Los Palillos criminal organization that broke its ties with the Arellano-Felix Organization in Mexico and relocated to San Diego.

In July 2012 a jury convicted Nancy Michelle Mendoza Moreno (Moreno)—a Mexican citizen and resident of Tijuana, Mexico—of one count of conspiracy to commit kidnapping for ransom (count 1: Pen. Code,[1] §§ 182, subd. (a)(1), 209, subd. (a) (hereafter section 209(a)), victim: Eduardo Gonzalez-Tostado (Tostado)) and two counts of kidnapping for ransom (counts 2 & 4: § 209(a), victims: Tostado and Jorge Garcia-Vasquez (Vasquez), respectively). The jury found Moreno not guilty of a third count of kidnapping for ransom (count 3).

Regarding the count 2 kidnapping for ransom of Tostado, the jury found to be true a sentence enhancement allegation that Tostado suffered bodily harm and was intentionally confined in a manner that exposed him to a substantial risk of death (§ 209(a)). Regarding each of the three counts of which Moreno was found guilty, the jury found to be true allegations that (1) Moreno committed the crime for the benefit of, in association with, or at the direction of a criminal street gang (§ 186.22, subd. (b)(1)); and (2) Moreno was a principal in the offense and at least one principal personally used a firearm in the commission of the offense (§ 12022.53, subds. (b), (e)(1)).

Moreno's trial counsel was Sandra Resnick. At the sentencing hearing, Moreno was represented by new counsel, Elizabeth Comeau (who is also Moreno's counsel on

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

2

appeal), and another attorney, Merle Schneidewind. The court denied Moreno's motion to set aside the verdict, which was filed by Comeau and was based on Moreno's claims that Resnick had provided ineffective assistance of counsel. The court sentenced Moreno under section 209(a) to a mandatory state prison term of life without the possibility of parole for her conviction of the aggravated kidnapping of Tostado for ransom charged in count 2, plus a consecutive term of 10 years for the count 2 firearm enhancement, plus a consecutive term of life in prison with the possibility of parole for her count 4 conviction of kidnapping Vasquez for ransom, plus a consecutive term of 10 years for the count 4 firearm enhancement. The court imposed but stayed under section 654 a life sentence for Moreno's count 1 conviction of conspiracy to commit kidnapping for ransom and a consecutive 10-year term for the count 1 firearm enhancement. The court thus sentenced Moreno to an aggregate term of 20 years plus a consecutive term of life without the possibility of parole plus a consecutive term of life with possibility of parole.

The theory of defense was misidentification and third party culpability.

Moreno appeals, asserting more than 25 claims in her opening brief, supplemental opening brief, and supplemental letter brief. We affirm the judgment but remand the case to the superior court to amend the abstract of judgment, which incorrectly indicates the court ordered Moreno to pay a parole revocation fine under section 1202.45.

3

FACTUAL BACKGROUND

A. *The People's Case*

1. *The Los Palillos cartel*

Around 1986 a Mexican drug cartel known as the Arellano-Felix Organization (AFO, also known as the "Tijuana Cartel"), headed by Benjamin Arellano-Felix and his brother, Ramon,[2] took over the lucrative drug-trafficking corridor between Tijuana and San Diego. Benjamin was the leader of the AFO. Ramon was his enforcer and right-hand man who intimidated rival drug traffickers and cultivated relationships with corrupt officials.

As time passed the enforcement arm of the AFO became involved in kidnapping members of rival organizations, extracting information from them about rival organizations, and holding the victims for ransom. At its height the AFO had thousands of people working for it. One of the prominent members of the AFO was Jesus Labra Aviles (nicknamed "Chuy"), a senior partner who had been a major drug trafficker since the early 1970's.

In early 2002 Ramon was killed in a shootout in Mexico and Benjamin was arrested and extradited to the United States. Their brother, Javier Arellano-Felix ("El Tigrillo"), became the leader of the AFO. When Javier was arrested in 2006, the AFO leadership passed to a nephew of the Arellano-Felix brothers: Fernando Sanchez-Arellano.

---

[2]     We sometimes refer to individuals by their first names solely for the sake of clarity.

The structure of the AFO was divided into various levels. A strong leader headed the organization. He was assisted by a right-hand man who performed enforcer duties and employed lieutenants to carry out the functions of the cartel. Each lieutenant was in charge of a cell or crew consisting of between four and 30 individuals. Each cell had its own leader and performed a different function for the AFO.

Between 1998 and 2002 Victor Manuel Rojas-Lopez ("El Palillo") was the leader of an AFO crew based in Tijuana known as "Los Palillos," meaning "The Toothpicks." Victor's brother, Jorge Rojas-Lopez, assisted him. The major activities of Los Palillos were drug trafficking, kidnappings, and extortions. Victor was killed by the AFO in 2002 either because of a dispute over a woman or because he was independently trafficking drugs without turning the profits over to the AFO. Los Palillos stopped working for the AFO and Jorge fled to San Diego. Other members of his crew also fled, came to San Diego illegally, and assumed aliases.

Los Palillos moved its criminal activities to San Diego County and vowed to seek revenge against the AFO. From mid-2004 to mid-2007, its primary activities were kidnapping for ransom, murder, and drug trafficking. Its drug trafficking activities extended into Kansas City and Boston.

The members of Los Palillos in San Diego included (among others) its leader, Jorge Rojas-Lopez ("Jorgillo," "Palillo" or "Boss Number 1"); Jorge's right-hand man, Juan Estrada-Gonzalez ("Freddy," "Pepe" or "Boss Number 2"[3]); Jorge's uncle, Raul

---

3     "Jefe Numero Dos."

5

Rojas-Gamez ("Tio"); Jorge's brother-in-law, Jesus Gonzalez-Trujillo ("Compadre"[4]); Edgar Frausto-Lopez ("Monkey" or "Tita"); Juan Laureano-Arvizu ("Chaquetin" or "Flaco"); Guillermo Moreno ("Memo"); Guillermo Moreno's half-brother, Carlos Pena ("Morro" or "Little Puppet"); Eduardo Monroy ("The Architect"); David Valencia ("Guero"); Jose Olivera-Beritan ("Chino" or "Asere"), who is from Cuba; and Jesus Lopez-Becerra ("Topo") and his brother, Gerardo Lopez-Becerra ("Tito").

2. *Kidnapping for ransom of Vasquez* (*count 4*)

In late 2006 and early 2007, Vasquez ("Kilino") lived with his wife in Chula Vista and owned a real estate business in Tijuana. His wife was the sister of Chuy Labra, a high-ranking AFO member. Vasquez was a member of a 24-Hour Fitness in Bonita.

On January 15, 2007, Moreno signed and dated an application for a one-month membership which was to expire on February 13. She applied under the name "Nancy Mendoza," listed her address as 1785 Simpatico Court in San Diego, and gave a phone number. In order to obtain a membership, the customer was required to provide a valid government-issued photo identification. The customer was required to show that identification each time he or she used the gym.

Moreno visited the gym six times between January 18 and January 31, 2007. All six times she entered the gym at around 8:00 a.m.

Sometime in January 2007 Moreno approached Vasquez, who had never seen her before. Moreno said her name was "Nancy" and asked Vasquez if he could help her with

---

4      "Godfather."

6

some exercises.  Moreno told Vasquez she was Mexican but did not tell him her last name.  After Vasquez helped her exercise, Moreno told him she would see him the next day and left.

The next day and on a few occasions after that, Moreno came to the gym when Vasquez was there and asked him for help.  Moreno told him she was from Tijuana and was living with her aunt, who was supporting her.  Two or three times, after they had worked out, Moreno and Vasquez went to eat at an IHOP in National City.  Vasquez drove Moreno there in his SUV; Moreno left her grey Chevy Equinox at the gym.

On January 31 Moreno arrived at the gym shortly after Vasquez arrived.  While they were working out, Moreno asked Vasquez whether he could suggest some protein supplements and Vasquez agreed to take her to a store to buy some.  Vasquez suggested they go in his car, but Moreno said, "No.  Let's take mine."

As they were leaving the gym in her car, Moreno received a call on her cell phone.  When Moreno finished talking on the phone, she told Vasquez her aunt forgot her key and she had to drop a key off for her.  She told Vasquez she would put the key under the door mat and then they would leave.

Moreno drove onto Interstate 805, took the 805 to the 54 freeway, and exited on Rio Drive.  Moreno appeared nervous during the drive and kept looking in her car mirrors.

When they reached Rio Drive, Moreno drove down a side street and stopped.  A van pulled up behind them and five or six men got out of the van.  They were wearing police gear and yelled, "Police!"

7

Suspecting that the men were not law enforcement officers, Vasquez locked the car doors. Moreno unlocked them. The men then opened the passenger-side door, grabbed Vasquez, pulled him out of the car, and tried to force him into the van. As they were trying to force Vasquez into the van, one of the men hit Vasquez twice in the area of his left chest with a weapon Vasquez testified was a "pistol." Vasquez later indicated in his testimony that he had been shocked in the chest by some sort of electric gun. Vasquez lost consciousness. The men threw him into the van, restrained his hands with masking tape, and covered his eyes.

Vasquez regained consciousness in a small room that appeared to be a family room. The kidnappers had taken his watch, wallet, credit card and cash. Two men arrived at the house about half an hour later. They referred to Vasquez by his nickname, Kilino, and told him they wanted money and were not going to kill him. When they demanded $2 million, Vasquez responded he did not have it. The men told him to gather the money from "Don Chuy" (Chuy Labra). Vasquez told the men Labra had been in custody since 2000 and he had no way of contacting him. The men then told Vasquez to get in touch with his nephews (Labra's sons). The kidnappers had him call a friend and business partner, Antonio Ortiz, tell Ortiz he had been kidnapped, and ask Ortiz to gather ransom money. Vasquez made a similar call to his wife.

Vasquez testified the kidnappers held him for 22 days. He was taken to an upstairs bedroom, and he was blindfolded and handcuffed. The kidnappers put him in a closet, warned him they had guns, and told him they would kill him if he tried to escape. Two or three people guarded him. One had a Cuban accent; another called himself

8

"Juanito." Occasionally individuals who seemed to be in charge came into the room and talked to the guards.

While Vasquez was held captive, his nephew (Labra's son), Jesus Manuel Labra-Felix, received a call from Vasquez's wife. She told him Vasquez had been kidnapped, asked for financial help, and said Felix should contact a man named "Antonio" in Tijuana who would take over from there. Felix got the money from his companies and several payments totaling $300,000 were made.

On February 22, 2007, the kidnappers told Vasquez he was leaving. They gave him his wallet, car keys, and a phone, and told him the phone was to allow them to contact him because they wanted more money. They told Vasquez that if he did not raise another $150,000 to $200,000, they were going to kidnap his nephews.

The kidnappers then escorted Vasquez, who was still blindfolded, to a white Escalade. Vasquez testified that they made him crouch down in the back of the vehicle, and a guard sitting next to him "had a rifle." The kidnappers drove Vasquez to Terra Nova Plaza, where he was released. One of his brothers was waiting for him in the parking lot. When he returned home, Vasquez told his wife to warn his nephews about the kidnappers' threat. After he learned about the threat, Felix raised another $140,000 and had it delivered to the kidnappers.

3. *Kidnapping of Tostado* (*counts 1-2*)

In June 2007 Tostado, a wealthy Mexican businessman, lived with his wife and their daughter in Chula Vista. Tostado owned several businesses in Mexico and a car dealership called Motorland in the United States.

9

Tostado lived in a gated community that required a code to gain access. In May 2005 Los Palillos member Eduardo Monroy (the Architect) did some remodeling work at Tostado's home. Tostado gave him the gate access code.

Tostado was also a friend of David Valencia, another Los Palillos member. They had met several years earlier at the 24-Hour Fitness in Bonita. Monroy occasionally went with Valencia and Tostado to off-road races. In around 2003 Tostado had a falling out with Valencia and they no longer communicated with one another.

One evening towards the end of May 2007, Tostado found on his doorstep a note in Spanish with a name and a phone number. The note told him to call "Roberto" regarding an urgent matter. Tostado checked his surveillance footage to find out who left the note. The video showed a man get out of a Volkswagen Beetle. Tostado did not know the man, but his cousin, Sergio Tostado, recognized him as Juan Laureano-Arvizu (Chaquetin), a member of Los Palillos.

Tostado used a public phone to make the call and a man (Arvizu) answered. Arvizu referred to Tostado by his first name, and told him "people" wanted to kidnap him and harm him. Arvizu asked Tostado for money and told Tostado he was giving Tostado information because he was "pissed off at these people who want to kidnap you." Tostado told Arvizu he would call him back.

The following day Tostado called Arvizu from his restaurant in Tijuana. Tostado told Arvizu he knew his name was Juan and that he would not give him money without more details. Arvizu said the man he worked for owed him $34,000 and that "this was serious." Arvisu also told Tostado that if he gave Arvisu $50,000, he would tell Tostado

10

the name of the person who wanted to kidnap him. Arvizu told Tostado that the Architect had given him the gate code to Tostado's house. Tostado offered Arvizu $5,000 if Arvizu would come to the restaurant and give further details, but Arvizu declined the offer, telling Tostado he did not go to Mexico. Tostado told Arvisu he would think about it and call him back. Tostado never spoke to Arvizu again. However, fearing he might be kidnapped, Tostado told his wife to contact the police if anything happened to him.

Around this same time period, an employee at Tostado's car dealership told him Valencia wanted to talk to him. The employee said Valencia had been in the hospital, had stopped drinking, had moved back in with his wife and children, was interested in talking to Tostado about buying some cars from him, and had been trying to reach him. Tostado arranged to meet Valencia at a coffee shop in Bonita.

During their meeting, Tostado agreed to purchase two cars for Valencia at an auction to be held on June 7. Valencia gave Tostado a check for $40,000. Tostado later successfully bid on the cars at the auction.

That evening, Tostado and Valencia got together at the same coffee shop. When Tostado told Valencia he had purchased the cars, Valencia told him he had a friend with a nice car who might want to sell it to Tostado for a low price, and the friend was on his way over. Tostado waited while Valencia called someone.

They waited 15 minutes but the friend did not show up. However, Moreno arrived and spoke to Valencia in Spanish. Valencia then told Tostado he wanted to introduce him to a friend of his. After Moreno told Tostado her name was Nancy, she ended her

11

conversation with Valencia and went inside the coffee shop. Valencia showed Tostado photos on his cell phone depicting a young woman wearing lingerie. Moreno came back outside with a cup of coffee, gave Tostado a kiss on the cheek, told Valencia she would see him later, and walked away.

Shortly thereafter, Valencia received a call on his cell phone and then handed the phone to Tostado. Moreno was calling. Moreno asked Tostado whether he would like to go out to dinner with Valencia and her, and then asked Tostado to call her. Tostado asked Valencia about the friend who was interested in buying a car, and Valencia replied he did not know what happened to him.

On June 8 Tostado and Valencia met again at the coffee shop and briefly discussed the cars Tostado had purchased for Valencia. Later, at around 4:00 or 5:00 p.m., while he was at a restaurant with a friend, Tostado telephoned Moreno and invited her to join them. Moreno declined but asked Tostado to call her in an hour, saying she had just finished working out and had to go home to change her clothes. Tostado called her an hour later and asked her where they should go. Moreno asked Tostado to pick her up at a coffee shop and then take her to a bar in Tijuana. Tostado drove to the coffee shop in his black Range Rover.

When Tostado arrived at around 6:30 p.m., he saw Moreno sitting outside. Tostado drove into the parking lot and telephoned her. Moreno came over and got into Tostado's car. Tostado asked her why she wanted to go all the way to Tijuana to have a

12

drink. Appellant said she was 20 years old,[5] which was above the legal drinking age in Mexico but not in the United States.

Before they left the parking lot, Moreno told Tostado she needed to go home to get her passport or visa and change her clothes. She also told him her house was nearby, she lived with her aunt, and he should follow her there. Moreno got into her car, a gray Jeep Liberty with a "Hank Rohn" bumper sticker on the back, and drove to a house a couple of blocks away, parked, and went inside the house. Tostado followed her in his car.

While Moreno was inside the house, Tostado received a call from a few of his employees, who asked him to bring them some money for food. Moreno came back outside and invited Tostado into the house. She told him her aunt had left for Tijuana and, if he wanted, they could have a drink in the house. Tostado told Moreno he needed to see his employees but he would return in a few minutes.

Tostado drove to Motorland and returned about 15 minutes later. On the way back, he stopped at a liquor store and purchased alcohol, condoms, and a flower. When he returned to the house, Moreno's car was no longer in the driveway; it was parked on the street. As Tostado was getting out of his own car, a Chevy Equinox and an SUV drove past him. A man wearing a baseball cap was driving the Equinox. The man pulled into the cul-de-sac, drove slowly around, passed Tostado again, and drove away. Tostado telephoned Moreno and asked her whether she was expecting anyone. She said she was not and told him to come inside the house.

---

5    Stipulated evidence established that Moreno was born on June 30, 1988. Thus, she was just under 19 years old at the time of these events in June 2007.

Tostado walked up to the front door, carrying the bags of items he purchased from the liquor store, and Moreno was standing there and inviting him in with the door open. She took one of the bags and invited Tostado inside. When Tostado entered the house and walked toward the living room, three men carrying long assault rifles ran towards him from down the hallway. They were wearing ski masks, black police vests, and caps with the words "FBI" and "police" on them. Two more men jumped Tostado from behind. One grabbed him by the hands and the other grabbed him by the feet. One of the men carrying an assault rifle struck Tostado in the head with the butt of the rifle, and he was shocked numerous times in the back with a Taser. Tostado fell to the ground and five of the men kicked Tostado in the head and stomach. Tostado passed out.

When Tostado regained consciousness, he was face down on the ground with a towel over his eyes and his feet and hands were tied behind his back. His watch, wedding ring, wallet, and shoes were gone. One of the men did a head count in Spanish and counted eight other people in the room.

Two men dragged Tostado by his hands to the back of the house and replaced the towel over his eyes with a blindfold. One of them, who seemed to be the leader of the group, did all of the talking. The leader told Tostado a lot of the men in the house were armed, and "if you try to do anything stupid, we're going to kill you." The leader then told Tostado he was being kidnapped and they wanted money. The man walked Tostado, who was handcuffed, to a small closet or pantry and put him inside. The leader again told Tostado not to do anything stupid; that they were going to chain him, it was "nothing personal," and they just wanted money.

While the leader was talking to Tostado, Tostado overheard Moreno ask someone whether she could leave. She did not sound frightened. Moreno asked which car she should take, and the leader told her to take the Range Rover. Tostado did not hear Moreno's voice again.

The leader bound Tostado's feet with a large chain, secured with two or three Master locks. He locked the chain to the handrail of a flight of stairs. The leader telephoned someone and said, "We got him." Later, Tostado heard other people coming and going. The leader told Tostado to call him "Boss 1" and then introduced two others as "Boss 2" and "Boss 3."

That night, Boss 1 ordered Tostado to come up with $2 million to secure his release, and Tostado replied he did not have that kind of money. Boss 1 said, "You can do it," and told Tostado they had wanted to kidnap him for a few months, they had been surveilling his house, and they went to see him at a race in January. Boss 1 also said he was angry with the AFO because they killed his brother (Victor Manuel Rojas-Lopez).

Tostado told Boss 1 he knew who Palillo was and he never had any problems with him. Boss 1 said they could do anything they wanted "over here." He told Tostado they had "done this before," they killed "a brother of El Pareja," and they "got" Gordo, Junior, Balitas (the son of Balas), and Kilino.[6]

---

[6]     Tostado testified he recognized "El Pareja" as a member of the AFO. He also testified "Balitas" was the son of an AFO leader, Kilino (Vasquez) worked out at the same 24-Hour fitness as Tostado, and Tostado frequently saw him there. Tostado was not familiar with the names "Gordo" and "Junior."

Boss 1 told Tostado, "If you're like Balitas and give us maybe $1 million right now, we'll let you go the same day." Boss 1 also told Tostado that Kilino went to L.A. Fitness and frequently saw a girl over there. She was the "same girl" that went out. Boss 1 told Tostado the Architect gave them the access code to Tostado's house and provided information about Tostado's businesses. Boss 1 said he "didn't like [the Architect] at all" and offered to kill the Architect for an additional $50,000.

That evening, Boss 1 told Tostado, "They arrived." Tostado heard Boss 1 open the door and say, "Hey, Tio, how are you?"

The next morning, June 9, someone offered Tostado a drink of water. He did not recognize the person's voice, although he did overhear the voice of the man referred to as Tio. Later that day Boss 1 and Boss 2 came up to him, and Boss 1 said they wanted to get their money and "get this over with." Boss 1 said they would release Tostado for $1 million. Boss 1 called Tostado's wife, put Tostado on the phone, told him to ask her for money, and warned him not to say anything stupid or he would be killed. Tostado's wife was angry at Tostado for not coming home and hung up.

Boss 1 had Tostado call his wife again, then got on the phone himself and told her if she wanted to see her husband alive, she had better talk to him. Tostado told his wife to sell whatever she could and get as much money together as possible. He then called his cousin Sergio, told Sergio he had been kidnapped, and arranged for Sergio to be a point of contact for the family.

During the next eight days or so, Tostado remained locked in the pantry and chained to the stairs. While he was there, he learned the nicknames of three of his

16

kidnappers. Tio told Tostado to call him "The Cook." The two men who guarded Tostado were Morro (Carlos Pena) and Asere (Jose Olivera-Beritan, hereafter Beritan). Beritan, who had a Cuban accent, was in charge of the house. He said his family was in Cuba and he wanted to bring them to the United States. Pena told Tostado he liked off-road races and talked to Tostado about his car.

Sergio negotiated with the kidnappers for Tostado's release. After Tostado contacted Sergio about the kidnapping, Sergio got in his car and headed from his home in Ensenada to San Diego to help Tostado's family. When Sergio arrived in San Diego, Tostado's wife told him about the conversations she had with the kidnappers. Sergio spoke with Tostado's attorney, who contacted the FBI.

FBI Special Agent Lauren Wood met with Sergio and Tostado's wife the next day, June 10. They told her about the surveillance footage of Arvizu leaving the note on May 22, provided her with the telephone number listed on the note, and arranged to give her still photographs from the surveillance cameras. They agreed to record any calls they received from the kidnappers. Agent Wood also obtained their consent to trap and trace their phone numbers.

That night, a man called Sergio from a phone number Sergio did not recognize. The man said he was the boss and told Sergio he would let Tostado go for $2 million. When Sergio told him Tostado did not have that much money, the man replied he would take $1 million. Sergio told him it would be difficult to raise that amount. The man asked Sergio to give him an additional $100,000 and Tostado's Rolex watches as a side deal, and assured him Tostado was fine.

17

A multi-agency operation was set up to track and arrest the kidnappers. By June 15 Sergio had raised raised about $193,000 in ransom money. That day, one of the kidnappers called and told Sergio he would contact him on June 16 to arrange a ransom drop. The money and watches were turned over to Agent Wood. Some of the bills were photographed and documented, and everything was placed in a briefcase that contained a tracking device. Sergio would wear a body recorder so he could be followed when the kidnappers gave him instructions.

On June 16 Tostado overheard Beritan talking to someone on the phone. Beritan brought Tostado new clothing, escorted him in handcuffs to the back of the house, and had him wait while Boss 1 called Sergio.

Sergio received the call while he was meeting with Agent Wood at a fast food restaurant to receive the briefcase containing the photographed bills and tracking device. Agent Wood taped the body recorder to Sergio's chest and told him to follow the kidnappers' instructions and then return to the fast food restaurant.

When Boss 1 spoke to Sergio, he instructed Sergio to get in his car and take Interstate 805 south, stop at a gas station, and get back on the freeway. Boss 1 then told Sergio to take the 54 freeway, exit on the right, go to a large parking lot by a Mile of Cars, park near the fence, leave the money in the car, and walk away. Boss 1 directed Sergio to a bathroom and told him not to look back. A few minutes later the man called Sergio and told him he could leave. When Sergio returned to his car, the money was gone. Sergio returned to the fast food restaurant, gave the body recorder to Agent Wood,

18

and drove to Tostado's house. Tostado called him and said the kidnappers wanted more money.

During the ransom drop, law enforcement agents attempted to follow Sergio using the body recorder taped to his chest, but the audio did not work and they lost his trail. Agent Wood spoke to Sergio, who informed her he had made the ransom drop at the Mile of Cars in National City. Using the beacon signal in the briefcase of money, agents tracked the briefcase to a Mitsubishi Lancer with Baja license plates. The car went to a residence on Los Flores Drive and from there to the Comfort Inn on East Plaza Boulevard in National City. A man entered the Comfort Inn, came out 10 minutes later, and drove away. The car returned to Los Flores Drive, where a second man got into the car. The two men drove to a juice bar in Chula Vista, stayed there for about half an hour, and then went to the Las Americas mall in San Ysidro. The men parked near the Neiman Marcus Last Call Outlet, went inside, purchased pants, shirts, shoes, and socks, and drove away. A Toyota MR2 was parked in the driveway. A police perimeter was set up around the residence. At around 6:15 p.m., the Lancer drove away. The same two men were inside, along with the briefcase that contained the tracking device. SWAT agents stopped the vehicle, and the men were identified as Jorge Rojas-Lopez and Juan Estrada-Gonzalez. The Toyota also left and was stopped. The sole occupant was Rojas-Gamez.

Agents announced their presence at the house and called for the suspects to come out with their hands up. Pena ran out the back. Beritan removed Tostado's blindfold and handcuffs, and then he (Beritan) put one of the handcuffs on his own hand and put the blindfold around his head. Tostado informed the agents Beritan was one of the

19

kidnappers. Beritan was placed under arrest. Pena was arrested attempting to flee out of the back of the house.

4. *Investigation*

After Tostado was rescued, Agent Wood interviewed him, showed him photos, and asked whether he could make identifications. He was able to identify Asere as Beritan, Morro as Pena, and Tio as Rojas-Gamez. Although he never saw Boss 1, Boss 2, or Boss 3, he was able to identify Boss 1 and Boss 2 by their voices. Boss 1 was Jorge Rojas-Lopez and Boss 2 was Juan Estrada-Gonzalez. Among the items found in Estrada-Gonzalez's possession when he was arrested was a card key for room 301 at the Comfort Inn in National City.

Tostado explained the involvement of a woman named Nancy in his abduction, but he was unable to provide authorities with her last name. Agents went to the Comfort Inn and obtained computer printouts for guests registered there between June 14, 2007 and June 18, 2007. She presented a Mexican identification card with no date of birth. A man paid cash for the room.

Marco Mercado, an investigator for the district attorney's office, obtained information from Guillermo Moreno, who was cooperating with authorities. The investigator for Guillermo Moreno's attorney provided Mercado with a photograph of a woman named Sayra Peralta Noriega. Tostado told Mercado the woman in the photo looked like Nancy.

Guillermo Moreno told Mercado that Nancy was associated with Juan Estrada-Gonzalez, so Mercado began listening to Estrada-Gonzalez's jail calls. On July 5, 2008,

20

Estrada-Gonzalez called a number and spoke to a woman for 45 minutes. Someone who was with the woman said, "Nancy, we need to leave." Estrada-Gonzalez had a 38-minute telephone conversation with the same woman on September 20.

On November 13, Mercado conducted a search of Estrada-Gonzalez's jail cell and found photographs of Moreno and another girl in lingerie. Mercado spoke to Tostado again and handed him a booking photo of Sayra Noriega. Tostado asked, "Who is this?" Mercado then showed Tostado one of the photos of Moreno seized from the cell. Tostado looked at the photo and identified the woman as Nancy (Moreno). Tostado looked at photos of Noriega and Moreno side by side and indicated he was positive the woman in the photos was Nancy.[7]

On December 13, 2008, Mercado monitored and listened to a third telephone conversation between Estrada-Gonzalez and Moreno. Moreno told Estrada-Gonzalez she was working and was going to school. Estrada told her, "Hold on. Don't say where you're going to school. Don't say where you're working." Moreno replied, "I know. I know." Another woman came into the room where Moreno was on the telephone and Mercado heard her ask Moreno, "What have you been up to? How are you doing?" Moreno told the woman, "I'm going to school. I'm working." Moreno then told the woman she was working at the Eighth Street Police Station, which Mercado knew was in Tijuana. Estrada-Gonzalez became upset and said, "I told her not to say anything."

_____

[7]    Tostado also positively identified Moreno in court during the trial, testifying he was a "hundred percent" certain she was the person who met with him at the coffee shop and told him her name was Nancy.

Estrada-Gonzalez then told Moreno, "I was able to hear everything that you said." Moreno told him she was not concerned about that; she was concerned about the photos found in his jail cell.

Through the subscriber information for the phone number Estrada-Gonzalez called to speak with Moreno, Mercado obtained Moreno's name and date of birth.

Mexican authorities arrested Moreno and arrangements were made to have Moreno extradited to the United States. During the extradition process Moreno signed several formal documents and the signing was videotaped by Mexican authorities.

In early January 2011, Moreno was extradited from Mexico and booked into custody. She filled out several forms and Mercado witnessed her signing the forms. Mercado compared these known signatures to the ones on the 24-Hour Fitness records from January 2007. Mercado opined that the signatures were made by the same person.

Mercado obtained records from Southwest Airlines for several known members of Los Palillos. Three of the gang members─Moreno, Guillermo Moreno, and Jesus Lopez-Berrera─used their true names to book their flights, while the others used aliases. On August 27, 2006, a person using the name Nancy Mendoza flew from San Diego to Kansas City. On that flight she flew with Los Palillos members Guillermo Moreno, Gerardo Lopez-Becerra, and Estrada-Gonzalez. Two days later, on August 29, she flew back alone to San Diego from Kansas City.

On September 16, 2011, Mercado interviewed victim Vasquez and showed him a six-pack photographic lineup. Moreno's photo was in the number six position. Vasquez

selected Moreno's photo and dated it.[8]  Vasquez told Mercado, "It looks a lot like her," but added that her hair was different.  Estrada-Gonzalez had love letters from Moreno dated January 18 and January 20, as well as photographs of her.  Photos of Estrada-Gonzalez were found in Moreno's cell.

5. *Accomplice testimony*:  *Carlos Pena*

Carlos Pena, who was between 19 and 20 years old at the time of the offenses, pleaded guilty to various charges and an agreed-upon prison sentence of between 26 years 8 months and 39 years 8 months in return for truthful testimony in several Los Palillos cases, including Moreno's.

Pena testified that in late 2006 and early 2007, he was living at a Los Palillos "stash house" (safe house) located at 6549 Garber Avenue in Paradise Hills.  He participated in several kidnappings and murders committed at that safe house.  His role was to guard the victims, feed them, and make sure they were allowed to use the bathroom.

Estrada-Gonzalez, Jesus Lopez-Becerra, and Gerardo Lopez-Becerra introduced Pena to Moreno while the group was at the 24-Hour Fitness in Bonita.  Pena spent about 30 minutes with her.  He was told a potential kidnap victim (Vasquez) worked out at the gym and Moreno would talk to him and get him over to the Garber Avenue residence.  Moreno needed a membership and Pena was there to assist her because she spoke little

---

8    Vasquez was unable to identify Moreno in court during the trial.  He stated he "[could not] say for sure" whether Moreno was the Nancy he met at the gym because "she's changed."

23

English.  The address on the application belonged to Pena's uncle.  Pena went back outside and left with Estrada-Gonzalez and the Lopez-Becerra brothers, who were waiting for him.  Moreno left in a separate car.

Pena eventually learned that the kidnapping (of Vasquez) was imminent.  Moreno had been going to the gym, coming back, reporting what she had done to various individuals, and those individuals had relayed the information to Pena.  Pena was told the kidnapping victim worked out in the mornings.  Moreno started to work out near the victim; and he offered her assistance with proper work-out technique.

The day of the kidnapping, Pena was told he would be called when the kidnappers got Vasquez.  Pena would then meet Moreno, who would be driving an Equinox, and he would take her to the border.  Pena drove his truck to a street about a mile from Garber and waited for a call.

Pena received the call and Moreno drove towards him in the Equinox.  Pena got out of his truck and met up with her.  He got into the driver's side of her Equinox while Moreno moved into the front passenger's seat.  Pena drove to the border, dropped Moreno off at the pedestrian crossing, and left.  Later, after Vasquez was released, Pena was paid $3,000 for his participation in the kidnapping.

Regarding Tostado's kidnapping, Pena testified that after two murders were committed at Los Palillos's Garber Avenue safe house, he and Beritan cleaned up the residence.  Pena moved into the residence at Point Dume Court.  He learned that David Valencia had gotten in touch with Tostado.  Valencia came over and talked to Pena about

24

using Moreno to lure Tostado to the safe house. Valencia said he had already introduced Tostado to Moreno and thought it would work.

On the day of Tostado's kidnapping, Pena was told to drive down the street and keep an eye out to make sure there was no police activity in the area. While parked at a liquor store, Pena saw Gerardo Lopez-Becerra's Jeep Liberty followed by a black Range Rover. The Jeep had a bumper sticker for a politician named "Hank" on the back. A woman was driving it. Pena, Beritan, and Rojas-Gamez guarded Tostado during his captivity. On June 16, 2007, shortly before the police raid, Jesus Lopez-Becerra paid Pena $5,000 for his efforts.

6. *Gang Evidence*

Ron Newquist, a detective with the San Diego Police Department Homicide Unit, testified as an expert on the Los Palillos cartel. Newquist opined that Los Palillos was a criminal street gang that existed from at least August 2004 to June 2007. Its primary activities were kidnapping for ransom, murder, and drug trafficking. The motive for these crimes was greed and revenge against the AFO. Los Palillos had a few different methods for committing these crimes, including dressing up as police officers and using "a pretty girl" as a lure.

To show a pattern of criminal activity, Newquist identified certified convictions for Los Palillos members Jorge Salvador-Moreno and Edgar Frausto-Lopez for crimes occurring on September 28, 2005. In that case, Salvador-Moreno and Frausto-Lopez drove up to a house owned by Salvador Parra, pulled into the driveway, and fired shots at

25

the house after Parra ran inside. When a police officer pursued them, they shot 27 rounds at his car.

Detective Newquist also identified a certified conviction for Jesus Lopez-Becerra for homicides committed in 2004 and 2005. In August 2004 a van containing three bodies was found in Chula Vista. There was writing on the van. In August 2005 the body of Olguin Verdugo, with writing on his back, was found dumped by Coors Amphitheater. There was writing on his back. That same month, Ricardo Escobar-Luna's body was found on Ola Court in Bonita. Ricardo's brother Victor ("Pareja") was a prominent member of the AFO.

Given a hypothetical mirroring the kidnapping of Vasquez, Newquist opined that the crime would be in association with Los Palillos because use of an "attractive female [was] the mechanism which allowed that to happen." The crime also benefited Los Palillos. The gang would receive a financial benefit from the ransom money, and it would instill fear in others who would learn of the gang's reputation. The crime sent a message that if the demanded ransom was paid, the victim would be released. If the victims were associated with the AFO, that organization would be hurt financially and Los Palillos would obtain its revenge. Newquist also opined that if Estrada-Gonzalez, Jorge Rojas-Lopez, or both, orchestrated the crime, it would have been committed at the direction of the gang.

Given a hypothetical mirroring the Tostado kidnapping, Newquist opined that the woman used as a lure acted in association with Los Palillos because she was the mechanism that allowed the crime to occur. The crime would benefit Los Palillos

26

through the collection of ransom and the exacting of revenge against the AFO.  Newquist also opined that if Boss 1 and Boss 2 were Jorge Rojas-Lopez and Juan Estrada-Gonzalez, and they directed the woman to lure Tostado to the Point Dume Court residence, then the crime would have been committed at the direction of the gang.

B. *The Defense*

Moreno began living with her aunt, Guadalupe Mendoza Arce, in Tijuana at the age of 11.  In 2006 and 2007, Moreno attended high school at the Instituto Frontera.  Students attended school Monday through Friday from 7:30 a.m. until 2:00 p.m.

According to one of Moreno's teachers, Luis Fernandez Medellin, the 2006 fall semester began on August 21, 2006 and ended January 12, 2007.  Moreno's aunt recalled that Moreno was in school up to and including January 31, 2007.  The next semester started February 6 or 16, 2007 and ended July 5 or 6, 2007.  Because Moreno did not obtain her driver's license until March 2008, Arce would drive her to school and often picked her up as well.  Moreno was a good student and graduated with a B average.  Medellin did not recall her being absent more than normal.

On June 9, 2007, Moreno attended a family renewal of vows in Orange County, California.  The ceremony started at 5:00 p.m.  The night before Moreno was at her aunt's house in Tijuana doing last minute things in preparation for the event.  However, it was possible Moreno crossed into the United States during the evening on June 8, 2007.

Moreno worked part time while she was in school.  In 2006 and 2007 she worked as a receptionist in the office of a Tijuana attorney, Raul Corona Sesma.  When Moreno was in school, she worked afternoons until about 6:00 p.m.  When she was on vacation,

27

she worked from 9:00 a.m. until 4:00 p.m.  Moreno later worked for the construction company where her aunt worked.  She worked there for six months through the end of December 2007.

Beginning in 2008 Moreno again worked for attorney Sesma, who by then was employed by the City of Tijuana.  Moreno peformed her work at the the 8th Street Police Station from 9:00 a.m. until 4:00 p.m. Moreno began attending college in August of 2008.

Dr. Mitchell Eisen, a forensic psychologist, testified about how memory works and the factors that affect the accuracy of eyewitness identifications.

DISCUSSION

I. *SUFFICIENCY OF THE EVIDENCE* (*TWO CLAIMS*:  *COUNT 2 & COUNT 4 SENTENCE ENHANCEMENTS*)

Moreno contends the evidence is insufficient to support the jury's true findings on two sentence enhancement allegations.  First, she contends the evidence was insufficient to support the jury's true finding on the count 4 allegation that during the commission of the kidnapping for ransom of Vasquez, at least one principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1).  Second, she contends the evidence was insufficient to support the jury's true finding on the count 2 allegation that Tostado, the victim of the kidnapping for ransom charged in that count, suffered bodily harm within the meaning of section 209(a), because Tostado's injuries "were not reasonably foreseeable" to her.  We conclude substantial evidence supports the jury's findings.

28

A. *Standard of Review*

When assessing a challenge to the sufficiency of the evidence supporting an enhancement, we apply the substantial evidence test. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1197.) Under that standard of review, "'we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 806 (*Wilson*).) The question we must answer after viewing the evidence in the light most favorable to the judgment, is whether *any* rational trier of fact could have found the elements of the underlying enhancement beyond a reasonable doubt. (*People v. Alvarez* (1996) 14 Cal.4th 155, 225.)

We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Thus, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury*, *supra*, 30 Cal.4th at p. 396.)

29

B.  *Analysis*

1.  *Section 12022.53 firearm enhancement (count 4)*

Subdivisions (a)(3) and (b) of section 12022.53 provides for a consecutive 10-year prison term for any person who in the commission of certain specified felonies—including kidnapping for ransom (§ 209)—"personally uses a firearm."  (§ 12022.53, subds. (a)(3), (b).)  As pertinent here, subdivision (e)(1) of section 12022.53 provides for vicarious liability under that section when (1) the defendant was a principal in the commission of the offense, (2) "[a]ny principal in the offense committed any act" specified in subdivision (b) of that section, and (3) and a street gang allegation (§ 186.22, subd. (b)) brought against the defendant is found to be true.[9]

Here, count 4 contained an enhancement allegation that Moreno was a principal in the kidnapping for ransom of Vasquez, and in the commission of that offense "at least one principal personally used a firearm" within the meaning of section 12022.53, subdivisions (b) and (e)(1).  The jury found the enhancement allegation was true[10] and the court imposed the consecutive 10-year prison term enhancement provided by subdivisions (b) and (e)(1) of section 12022.53.

---

[9]     Section 12022.53, subdivision (e)(1) provides in part:  "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:  [¶] (A)  The person violated subdivision (b) of Section 186.22.  [¶] (B)  Any principal in the offense committed any act specified in subdivision (b) . . . ."

[10]     The jury also found the count 4 street gang allegation (§ 186.22, subd. (b)(1)) was true.

30

Moreno contends the evidence was insufficient to support the jury's true finding on the foregoing count 4 firearm enhancement allegation. Specifically, she asserts that although the evidence showed "possession of [a] rifle in the van during [Vasquez's] release" following his kidnapping, Vasquez's testimony that the man guarding him in the van "had a rifle" was "simply too vague to permit an inference that it was being used." She also asserts that although "a principal used a taser during the commission of the kidnapping [of Vasquez]," a taser is not a firearm and, thus, "the use of a taser cannot support the [count 4] firearm allegation in this case."

We conclude the prosecution presented substantial evidence from which any rational jury could find that the man with a rifle who guarded Vasquez in the van was a principal in the kidnapping for ransom and "personally use[d] a firearm" within the meaning of section 12022.53, subdivisions (b) and (e)(1) as alleged in count 4. The California Supreme Court has explained that "[p]roof of firearm use during a felony does not require a showing the defendant ever fired a weapon. 'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies.'" (*Wilson*, *supra*, 44 Cal.4th at p. 806, italics omitted.) Thus, when a principal in the commission of a felony "deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim . . . so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may

31

freely urge the jury not to draw such an inference, but a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from [a firearm use enhancement]." (*People v. Granado* (1996) 49 Cal.App.4th 317, 325 (*Granado*).)

Here, Vasquez testified that his kidnappers escorted him to a white Escalade he could see even though he was blindfolded. Vasquez also testified they made him crouch down in the back of the car with his arms outstretched in front of him, and the guard sitting next to him "had a rifle."

From the foregoing substantial evidence a rational jury could reasonably find beyond a reasonable doubt that the guard was a principal in the kidnapping for ransom charged in count 4, and he "personally use[d] a firearm" within the meaning of section 12022.53, subdivisions (b) and (e)(1) because he engaged in "conduct which produce[d] a fear of harm or force by means or display of a firearm in aiding the commission of [the kidnapping]" (*Wilson*, *supra*, 44 Cal.4th at p. 806, italics omitted). There is "no evidence to suggest any purpose other than intimidating the victim . . . so as to successfully complete the [kidnapping for ransom]." (*Granado*, *supra*, 49 Cal.App.4th at p. 325.) Moreno's assertion that Vasquez's testimony that the guard "had a rifle" was "simply too vague to permit an inference that it was being used," is unavailing. The defense in this case was free to urge the jury not to draw such an inference, but the guard's "failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from [the firearm use enhancement]." (*Ibid*.)

32

For the foregoing reasons, we conclude Moreno's insufficiency-of-the-evidence claim with respect to the count 4 firearm use enhancement is meritless. In light of our conclusion, we need not, and do not, further address her related claim that substantial evidence does not support the enhancement because "a taser is not a firearm."

2. *Section 209(a) bodily injury enhancement (count 2)*

Moreno also contends the evidence was insufficient to support the jury's true finding on the count 2 allegation that Tostado, the victim of the kidnapping for ransom charged in that count, suffered bodily harm during the kidnapping within the meaning of section 209(a). She challenges the mandatory life-without-possibility-of-parole sentence imposed under section 209(a) as a result of the jury's finding, asserting Tostado's injuries "were not reasonably foreseeable" to her. Moreno's contention is unavailing.

Section 209(a) provides for a sentence of life without the possibility of parole when the victim of an aggravated kidnapping for ransom "suffers death or *bodily harm*, or is intentionally confined in a manner which exposes that person to a substantial likelihood of death." (Italics added.) When a defendant charged with aggravated kidnapping in violation of section 209 does not personally inflict the bodily harm on the victim, the defendant may not be sentenced to life without the possibility of parole unless the bodily harm was "the proximate result—the reasonably foreseeable consequence—of defendant's intentional acts." (*People v. Isitt* (1976) 55 Cal.App.3d 23, 29.)

Here, substantial evidence supports the jury's implied finding that the bodily harm Tostado suffered at the hands of his kidnappers was reasonably foreseeable to Moreno, who did not personally inflict Tostado's injuries. Tostado testified that Moreno told him

33

she lived with her aunt and he should follow her to her house before they drove to Tijuana to have a drink. When they arrived at the house, Moreno invited him to go inside with her, but he told her he needed to take care of some business and left for about 15 minutes. Before he left Moreno told him her aunt had left for Tijuana and, if he wanted, they could have a drink in the house. Tostado agreed to come back and have drinks in the house.

Tostado also testified that when he returned and entered the house as Moreno stood in the front door inviting him in, three men carrying long assault rifles ran towards him from down the hallway. The kidnappers were wearing ski masks, black police vests, and caps with the words "FBI" and "police" on them. Two more men jumped Tostado from behind. One of the kidnappers who was running towards him from down the hallway and carrying an assault rifle struck him in the forehead with the butt of the rifle. Tostado also testified he was shocked numerous times in the back with a Taser. He fell to the ground, several of the kidnappers kicked him in the head and stomach, and he passed out.

As discussed in detail in the factual background, *ante*, the prosecution also presented evidence that Moreno had been involved in the kidnapping of Vasquez, who testified that Moreno was in the car with him when the kidnappers dressed in police gear approached, Moreno unlocked the car doors after Tostado locked them, and one of the kidnappers tasered Tostado into unconsciousness during the abduction.

From the foregoing evidence, a rational jury could reasonably find that Moreno intentionally lured Tostado to the house where the kidnappers were waiting for him and

34

that the bodily harm the armed kidnappers inflicted on him was a reasonably foreseeable consequence of Moreno's act. We conclude Moreno's insufficiency-of-the-evidence claim regarding count 2 is without merit.

## II. *CRUEL AND/OR UNUSUAL PUNISHMENT CLAIM* (*COUNT 2 SENTENCE*)

Moreno challenges on various grounds the mandatory count 2 prison sentence of life without possibility of parole (LWOP) that the court imposed under section 209(a)[11] based on the jury's count 2 findings that (1) she kidnapped Tostado for ransom in violation of section 209(a), and (2) during the time he was subjected to the kidnapping, Tostado suffered bodily harm or was intentionally confined in a manner that exposed him to a substantial likelihood of death within the meaning of the mandatory LWOP provision of section 209(a).

Specifically, Moreno contends her count 2 LWOP sentence must be reversed and the matter remanded for resentencing because (1) the LWOP sentence mandated by section 209(a) violates the Eighth Amendment ban on cruel or unusual punishment when applied to a defendant like her; (2) the LWOP sentence constitutes cruel or unusual punishment under the California Constitution, and (3) the LWOP sentence also

---

[11] Section 209(a) provides that "[a]ny person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom . . . is guilty of a felony, and upon conviction thereof, *shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act suffers death or bodily harm, or is intentionally confined in a manner which exposes that person to a substantial likelihood of death . . . .*" (Italics added.)

constitutes cruel or unusual punishment under the federal Constitution.  We reject these contentions.[12]

A.  *Constutionality of the Mandatory LWOP Provision of Section 209(a)*

Relying principally on *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*), *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011] (*Graham*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), which address the constitutionality of sentences of life without the possibility of parole in juvenile cases, Moreno first contends the LWOP sentence mandated by section 209(a) (see fn. 11, *ante*) violates the Eighth Amendment ban on cruel and unusual punishment when applied to a defendant like her who committed her crimes when she was 18 years old.  She asserts "the Eighth Amendment bars a mandatory LWOP sentence for someone so close to the legal threshold between childhood and adulthood."  She also asserts that "[g]iven the imprecision in defining a juvenile . . . , a trial court presented with a defendant barely above the 18-year threshold who is facing a[n] LWOP sentence must be given authority to consider factors beyond mere age indicating whether the defendant deserves to be sentenced as an adult or a juvenile."  Moreno's contention and assertions are unavailing.

---

[12]     On appeal we review the legal correctness of the trial court's rulings, not the court's reasoning.  (*People v. Zapien* (1993) 4 Cal.4th 929, 976).  Accordingly, we need not discuss the court's reasons for rejecting the defense's argument that imposition of an LWOP sentence in this case was grossly disproportionate to Moreno's crime and violated the Eighth Amendment.

1. *Eighth Amendment*

"The Eighth Amendment [to the United States Constitution], which applies against the States by virtue of the Fourteenth Amendment, [citation], provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor *cruel and unusual punishments inflicted*.'" (*Harmelin v. Michigan* (1991) 501 U.S. 957, 962 (*Harmelin*), italics added.)

In *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), the United States Supreme Court explained that "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood." (*Id*. at p. 574.) The *Roper* court further explained that although the qualities distinguishing juveniles from adults do not disappear when an individual turns 18, "a line must be drawn." (*Ibid*.)

In *Graham*, the United States Supreme Court categorically held that the imposition of a prison sentence of life without the possibility of parole on a juvenile offender for a nonhomicide offense violates the Eighth Amendment's prohibition of cruel and unusual punishment. (*Graham*, *supra*, 560 U.S. at p. 82.) The court noted there are "fundamental differences between juvenile and adult minds" and juveniles are "more capable of change than are adults." (*Id*. at p. 68.)

More recently in *Miller*, the high federal court held the imposition of a *mandatory* sentence of life without the possibility of parole on a juvenile offender convicted of a homicide offense violates the prohibition of cruel and unusual punishment set forth in the Eighth Amendment. (*Miller*, 132 S.Ct. at p. 2469.) Citing *Roper* and *Graham*, the *Miller* court explained that in homicide cases involving juvenile offenders, a sentencer is required "to take into account how children are different, and how those differences

37

counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, at p. 2469, fn. omitted.) The *Miller* court elaborated, stating:

> "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." (*Id.* at p. 2468.)

However, the *Miller* court also stated that, in homicide cases, it was "not foreclos[ing]" the ability of a sentencer to impose "this harshest possible penalty" of life without the possibility of parole on "'the rare juvenile offender whose crime reflects irreparable corruption.'" (*Miller*, *supra*, 132 S.Ct. at p. 2469.)

In *Caballero*, the California Supreme Court, citing the United States Supreme Court's *Graham* and *Miller* decisions, held that a 110-year-to-life prison term imposed on a juvenile for a nonhomicide offense constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. (*Caballero*, *supra*, 55 Cal.4th at pp. 265-269.) The *Caballero* court reasoned that the term imposed on the juvenile offender in that case was the functional equivalent of the unconstitutional life-without-possibility-of-parole sentence imposed on the juvenile in *Graham*. (*Caballero*, at pp. 268-269.) It further noted that *Graham* requires a sentencing court to consider all

mitigating circumstances, including the chronological age of the juvenile at the time of the crime, whether the juvenile was the direct perpetrator or an aider and abettor, and his or her physical and mental development. (*Caballero*, at pp. 268-269.)

2. *Analysis*

Here, Moreno was born in late June 1988. Thus, she was just under 19 years of age in early-to-mid-June 2007 when she participated in Tostado's kidnapping. Moreno acknowledges that "at the time of charged offenses, [she] . . . had reached the age at which the law no longer treats her as a juvenile for criminal sentencing purposes."

We reject Moreno's claim that the mandatory LWOP provision of section 209(a) violates the Eighth Amendment's prohibition of cruel and unusual punishment when it is applied to someone like her who is almost 19 years of age. As noted, her claim is premised on her contention that the court should have considered the same juvenile sentencing factors that were at issue in *Graham*, *Miller*, and *Caballero*. However, the Court of Appeal rejected an identical contention in *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482, and later in *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221. The *Argeta* court explained:

> "These arguments regarding sentencing have been made in the past, and while '[d]rawing the line at 18 years of age is subject . . . to the objections always raised against categorical rules . . . [that] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.] Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude [defendant's]

39

sentence is not cruel and/or unusual under *Graham*, *Miller*, or *Caballero*." (*Argeta*, at p. 1482; accord, *Abundio*, at pp. 1220-1221.)

We agree with the holdings and analysis in *Argeta* and *Abundio*. Because Moreno was almost 19 when she participated in the violent kidnapping for ransom of Tostado, and she acknowledges she "had reached the age at which the law no longer treats her as a juvenile for criminal sentencing purposes," we conclude the court properly imposed an LWOP sentence for her count 2 conviction as mandated by section 209(a), which does not violate the Eighth Amendment's prohibition of cruel and unusual punishment when applied to someone like Moreno.

B. *The LWOP Sentence Is Permissible Under the California Constitution*

Moreno next contends the count 2 LWOP sentence imposed for her participation in the kidnapping for ransom of Tostado violates the California Constitution's prohibition of cruel or unusual punishment "because it is so disproportionate to her personal culpability, to the way more serious crimes are punished in California, and to the way similar kidnappings are punished throughout the country that it shocks the conscience and offends fundamental notions of human dignity." This contention is unavailing.

1. *Applicable law*

Sections 17 and 24 of article I of the California Constitution set forth the same prohibition as that set forth in the Eighth Amendment. Article I, section 17 provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." Section 24 of that article mandates that California courts interpret the California cruel or unusual punishment prohibition in a manner consistent with the federal Constitution.

40

The California Supreme Court has emphasized that a defendant must overcome a "considerable burden" in challenging a penalty on the ground it constitutes cruel or unusual punishment under the California Constitution. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) Our high court has stated that "[t]he doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment." (*Ibid.*; see *People v. Dillon* (1983) 34 Cal.3d 441, 477 (*Dillon*).)

Our high state court explained in *In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*) the function of the judiciary in enforcing the constitutional prohibition against cruel or unusual punishment:

> "[L]egislative authority remains ultimately circumscribed by the constitutional provision forbidding the infliction of cruel or unusual punishment, adopted by the people of this state as an integral part of our Declaration of Rights. It is the difficult but imperative task of the judicial branch, as coequal guardian of the Constitution, to condemn any violation of that prohibition. [¶] As we concluded in *People v. Anderson* (1972) 6 Cal.3d 628, 640, 'The Legislature is thus accorded the broadest discretion possible in enacting penal statutes and in specifying punishment for crime, but the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function.'" (*Lynch*, *supra*, 8 Cal.3d at p. 414; see *Dillon*, *supra*, 34 Cal.3d at pp. 477-478.)

In *Dillon,* the California Supreme Court reaffirmed the rule it adopted in *Lynch, supra,* 8 Cal.3d 410 that "a statutory punishment may violate the constitutional prohibition not only if it is inflicted by a cruel or unusual method, but also if it is grossly

41

disproportionate to the offense for which it is imposed." (*Dillon*, *supra,* 34 Cal.3d at p. 478, fn. omitted, citing *Lynch*, *supra,* 8 Cal.3d 410.)

Our high state court has adopted three techniques (the *Lynch* techniques) that California courts have used to determine whether a particular sentence is so grossly disproportionate to the offense for which it is imposed that it constitutes cruel and unusual punishment within the meaning of the Eighth Amendment. (*Dillon*, *supra*, 34 Cal.3d at p. 479 ["In each such decision the court used certain 'techniques' identified in *Lynch*[, *supra*, 8 Cal.3d at pages 425-429,] to aid in determining proportionality."].)

The first *Lynch* technique is an examination of the "nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*Lynch*, *supra*, 8 Cal.3d at p. 425; see *Dillon*, *supra*, 34 Cal.3d at p. 479.) In conducting the inquiry into the "nature of the offense," the courts "are to consider not only the offense in the abstract—i.e., as defined by the Legislature—but also 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*Dillon*, *supra*, 34 Cal.3d at p. 479.) The related inquiry into the "nature of the offender" is focused "on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

42

Under the second *Lynch* technique, the courts "compare the challenged penalty with the punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious." (*Lynch*, *supra*, 8 Cal.3d at p. 426, italics omitted.)

The last *Lynch* technique employed by California courts is a comparison of the challenged punishment with punishments for the same offense in other jurisdictions. (*Lynch*, *supra*, 8 Cal.3d at p. 436.)

Ultimately, the test to be applied in California for determining whether a particular punishment violates the California constitutional prohibition against cruel or unusual punishment is whether, "'although not cruel or unusual in its method, it is *so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity*.'" (*Dillon*, *supra*, 34 Cal.3d at p. 478, italics added, quoting *Lynch*, *supra*, 8 Cal.3d at p. 424.)

It is permissible to base the determination of whether the punishment constitutes cruel and unusual punishment solely on the nature of the current offenses and the offender. (*People v. Ayon* (1996) 46 Cal.App.4th 385, 399, disapproved on another point in *People v. Deloza* (1998) 18 Cal.4th 585, 593, 600, fn. 10; *People v. Young* (1992) 11 Cal.App.4th 1299, 1308-1311; *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1198-1200.)

2. *Analysis*

After considering the nature of both the offense (kidnapping for ransom of Tostado) and the offender (Moreno), we conclude Moreno's LWOP sentence does not violate the California Constitution's prohibition of cruel or unusual punishment because it

43

is not "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

Moreno's prior participation in the violent kidnapping of Vasquez and her role in luring him to his kidnappers are detailed, *ante*, in the factual background. Based on Moreno's involvement in that prior kidnapping, a jury reasonably could find beyond a reasonable doubt that Moreno knew Tostado's kidnappers would use violence against him.

The evidence thus shows that Moreno's participation in Tostado's kidnapping was sophisticated, calculated, and prolonged, and that she acted with intent, planning, and awareness that the perpetrators of the crime were armed and likely would use violence against Tostado. Her role in luring Tostado to his kidnappers inside was essential to the commission of that violent offense. We conclude the imposition of the LWOP sentence for her conviction of count 2 is not unconstitutionally disproportionate to her culpability and thus does not violate the California Constitution's prohibition of cruel or unusual punishment.

C. *The LWOP Sentence Is Permissible Under the Federal Constitution*

Moreno also contends the LWOP sentence imposed for her participation in the kidnapping for ransom of Tostado must be reversed because it is grossly disproportionate under the Eighth Amendment's ban against cruel and unusual punishment. We reject this contention.

1. *Applicable law*

Under the Eighth Amendment, challenges to the length of a sentence are rarely granted. (*Solem v. Helm* (1983) 463 U.S. 277, 289-290 (*Solem*) ["'[outside] the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare'"].) The United States Supreme Court has explained that reviewing courts "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." (*Id*. at p. 290, fn. omitted.) The high court has explained that "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." (*Harmelin*, *supra*, 501 U.S. at p. 1001.)

In *Solem*, the Supreme Court set out a three-prong test similar to the one adopted in California to address claims of disproportionate sentences:

> "[A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Solem*, *supra*, 463 U.S. at p. 292.)

However, the high court subsequently circumscribed this test, stating the comparative analysis of the second and third prongs is appropriate only when the analysis of the first prong "leads to an inference of gross disproportionality." (*Harmelin*, *supra*, 501 U.S. at p. 1005.)

2. *Analysis*

A consideration of both the gravity of Moreno's count 2 offense and her count 2 LWOP sentence does not "lead[] to an inference of gross disproportionality" (*Harmelin*, *supra*, 501 U.S. at p. 1005) notwithstanding her lack of a prior criminal record. We have already concluded that the overwhelming evidence of Moreno's guilt, which we need not repeat here, shows her participation in the violent kidnapping for ransom of Tostado was sophisticated, calculated, and prolonged, and she acted with intent, planning, and awareness that the perpetrators of the crime were armed and likely would use violence against Tostado. As a member of the violent Los Palillos criminal street gang, Moreno's role in crossing the border and luring Tostado to his armed kidnappers was essential to the commission of the violent count 2 offense of which the jury found her guilty. We conclude the imposition of the LWOP sentence mandated by section 209(a) for her conviction of count 2 is not grossly disproportionate to her culpability and thus does not violate the Eighth Amendment's prohibition of cruel and unusual punishment.

III. *DENIAL OF MORENO'S NEW TRIAL MOTION ("NEWLY DISCOVERED" EVIDENCE: DIGITAL "NANCY" IMAGES) AND CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL*

In her supplemental opening brief, which was prepared by her new appellate counsel Elizabeth Comeau, Moreno contends the court erred in denying her motion for a new trial, which was based on what she claims was newly discovered evidence consisting of photographs of a woman found in files labeled "Nancy(1).bmp" and "Nancy.bmp" taken from codefendant Beritan's laptop computer. Moreno also contends Resnick's "failure to investigate the [compact] disks [*sic*] [(CD's)] provided to her in discovery

46

violated [her] Sixth Amendment right to effective assistance of counsel."  These

contentions are unavailing.

A.  *Background*

In September 2012 Moreno, through her trial counsel Resnick, filed a motion for a

new trial under section 1181, subdivision (8) (hereafter section 1181(8), discussed, *post*)

on the ground there was newly discovered evidence material to her defense that

"somebody else used [her] name" to protect the identity of the woman who lured Vasquez

and Tostado to their kidnappers.  Specifically, Moreno asserted she learned in late July

2012 that a computer seized from codefendant Beritan contained files labeled "Nancy"

that contained photographs of another young Hispanic female.  Claiming Resnick never

received the files, Moreno stated that photos from the computer were introduced at

Beritan's trial to show he was at the Point Dume residence during the crimes, and the

defense had no way of knowing his computer had material evidence relating to this case.

Moreno asserted that "[i]f the defense had been armed with the knowledge that there was

another young female Hispanic named Nancy who associated with a member of Los

Palillos, it would have materially altered [her defense] strategy."  Copies of the photos

were attached to the motion as exhibits.

In support of her new trial motion, Moreno filed a declaration from defense

investigator Sue Lane, who stated that her husband, Jon Lane, also an investigator, had

received through his work on Beritan's case a CD containing images from Beritan's

computer.  Sue Lane stated that her husband reviewed the CD, found two files named

"Nancy," and showed those files to her.  One labeled "Nancy(1).bmp" contained six

images, and the other labeled "Nancy.bmp" contained one image.  In her declaration, Sue Lane described the folders and files contained on the CD.

Lane stated she had not seen the photos or files prior to July 27, 2012.  She further stated, "Due to my work providing technical support for [Resnick] during Nancy Mendoza Moreno's trial, I believe I would have been aware of the existence of these two files if they had been provided to [Resnick]."

In early March 2013 Moreno, represented by new cocounsel Elizabeth Comeau (her current counsel on appeal) and Merle Schneidewind, renewed her new trial motion. In support of her motion, Moreno resubmitted (among other things) the declaration of Sue Lane and the photos of "Nancy" found on Beritan's computer.  Moreno also submitted a declaration by Resnick stating that Deputy District Attorney Dan Owens, one of the prosecutors in this case, advised her she had signed a discovery receipt on April 12, 2012, which indicated she had received the CD.  Resnick indicated in her declaration that she looked at her files for that date and found a CD containing the entry, "RCFL Data Lab."[13]  She stated there was nothing on that entry to indicate that it contained an examination of Beritan's computer, but "[a] subsequent search of that file produced information regarding the examination of [Beritan's] computer by the RCFL."  Resnick also stated that in order to reach the "Nancy files" contained on the CD, she had to conduct "additional searches" described in Lane's declaration.

_____

[13]    San Diego Regional Computer Forensic Laboratory.

48

In its written opposition to Moreno's new trial motion, the prosecution argued Moreno's "untimely discovery of the 'Nancy' images" was not grounds for a new trial because the Nancy images were not newly discovered and Moreno had failed to show the outcome of the trial would have been different had they been presented. The prosecution also argued the digital images were provided to Resnick in April 2012 before trial, Resnick's own declaration acknowledged she received the CD containing those images, and the images were provided to the defense in the same format as were those given to the People. Thus, they were equally accessible to both parties and the prosecution was "under no obligation to point out what was easily discoverable by a few mouse clicks." The prosecution further argued that although Moreno claimed the photos could have been used to cross-examine victims Tostado and Vasquez, the issue of her identification as the woman who lured them was vigorously litigated. Vasquez was unable to identify appellant at trial or at the preliminary hearing and Tostado's identification was subject to thorough cross-examination. Thus, Moreno had "fail[ed] to establish any probability that the images would have changed the outcome of the trial."

In support of its opposition to the motion, the prosecution submitted the declaration of Deputy District Attorney Owens, who explained that the People's discovery in this case and a companion case was designed to efficiently log all documents and media provided to the defense, despite the large amount of discoverable information that had been generated during the investigation and prosecution of the Los Palillos criminal organization. Owens stated the People were mindful of their statutory and constitutional discovery obligations, and they "maintain[ed] a well-organized log of all

49

discovery items, documentation and media alike, provided by the People to defense counsel in the respective prosecutions of each charged individual." He indicated that on April 6, 2012, at 2:00 p.m., the People made available to Resnick a CD from the San Diego Regional Forensic Computer Laboratory, with its identifying stamp, RCFL, containing several media items. The items were in folders on the electronic discovery. Owens stated that Resnick received and signed for the CD on April 10 at 9:46 a.m. Item 10-65, "RCFL Data Lab 12-0031 - 2-14-12," contained data files seized from the Sony Vaio laptop computer recovered from the residence used by Los Palillos as a kidnapping safe house for victim Tostado. Owens stated that "[a]ll media items identified as "10-[#]" contained media associated with Incident 10, the incident addressing the crimes related to the kidnapping of [Tostado]." Owens also stated that "[t]he electronic files provided via discovery were identical to the form of the date files received from RCFL and no modification, distortion, or deletion took place when being uploaded onto the CD provided in discovery."

1. *Court's ruling*

Following oral arguments, the court denied Moreno's new trial motion. In its written order, the court stated the CD containing the two files "nancy(1).bmp" and "nancy.bmp" was provided to Resnick before trial as part of discovery and could have been found with reasonable diligence. The court found Sue Lane's declaration indicated she located them by opening one file folder and one subfolder. The court also found Moreno had failed to show the  photos from the files would render a different result

50

probable on retrial. The court stated there was "no evidence as to who the pictures depict, and the defense provide[d] no declarations or other evidence indicating the victims in this case would have positively identified the woman in the photos as the 'Nancy' that lured them to their kidnappers."

B. *Applicable Legal Principles*

A trial court may grant a defendant's motion for a new trial in a criminal case "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at trial." (§ 1181(8).)

A motion for a new trial based on newly discovered evidence is viewed with disfavor, and denial of such a motion rarely will result in a reversal on appeal. (*People v. Fairchild* (1962) 209 Cal.App.2d 82, 84.)

In order to obtain a new trial under section 1181(8), the moving defendant must show (1) the evidence, and not simply its materiality, is newly discovered; (2) the evidence is not merely cumulative; (3) the defendant in the exercise of reasonable diligence could not have discovered and produced the evidence at trial; (4) the newly discovered evidence is of such strength that a result more favorable to the defendant is probable if the new evidence is admitted on retrial; and (5) these facts are shown by the best evidence of which the case admits. (*People v. Howard* (2010) 51 Cal.4th 15, 42; 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Judgment, §§ 103 & 105, pp. 145, 146.)

51

A trial court's denial of a motion for a new trial will not be disturbed on appeal unless a manifest and unmistakable abuse of discretion is clearly shown. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

C. *Analysis*

We conclude the court did not abuse its broad discretion in denying Moreno's new trial motion. Under section 1181(8) Moreno was required to show the two laptop computer files in question containing digital photographs of a young Hispanic woman other than Moreno were "newly discovered." However, the declarations of Moreno's trial counsel Resnick and prosecutor Owens established that Resnick received and signed for the CD containing those files during discovery before trial. Thus, Moreno failed to meet her burden of showing the two files were "newly discovered" within the meaning of section 1181(8) because the files were in the possession of the defense before trial.

Moreno's claim that the files were newly discovered because they were not readily identifiable or easily found on the CD, is unavailing. Moreno was required to show under section 1181(8) that the defense, in the exercise of reasonable diligence, could not have discovered and produced the evidence at trial. The court found that defense investigator Sue Lane's declaration indicated she located the two files by opening one file folder and one subfolder. Lane's declaration supports the court's finding. Lane stated:

> "Contained on the CD are several folders and files. The first folder is labeled 'FTK report.' When that file is opened, it contains a folder labeled, 'files.' When the 'files' folder is opened, it contains lots of image files in numerical and alphabetical order. Scrolling down through the alphabetic listings reaches the two files that are labeled 'Nancy(1).bmp' and 'Nancy.'"

52

Had Moreno's trial counsel, Resnick, exercised reasonable diligence to peruse the folders and files contained in the CD provided to her by the prosecution, she would have found the "Nancy" images at issue here. We conclude Moreno has failed to meet her burden under section 1181(8) of showing that, in the exercise of reasonable diligence, she could not have discovered and produced those digital images at trial.

1. *Related claim of ineffective assistance of counsel* (*failure to investigate CD*)

In an ancillary claim, Moreno asserts Resnick's "failure to investigate the [CD's] provided to her in discovery violated [her] Sixth Amendment right to effective assistance of counsel." This claim is unavailing.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and, of particular importance here, (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) To show prejudice, the defendant must show a reasonable probability she would have received a more favorable result had her counsel's performance not been deficient. (*Strickland*, at p. 694; *Ledesma*, at pp. 217-218.)

Here, we conclude that Moreno has failed to meet her burden of establishing a reasonable probability she would have obtained a more favorable result at trial but for Resnick's failure to thoroughly investigate the CD she received from the prosecution in pretrial discovery. The issue of identification was thoroughly explored at trial. For example, Mercado, an investigator for the District Attorney's office, testified he

53

conducted a search of Estrada-Gonzalez's jail cell and found photographs of Moreno and another girl in lingerie. Mercado spoke to Tostado again and handed him a booking photo of Sayra Noriega. Tostado did not recognize her. Mercado then showed Tostado one of the photos of Moreno seized from the cell. Tostado looked at the photo and identified the woman as the Nancy who had lured him to the kidnappers. Mercado also testified that Tostado looked at photos of Noriega and Moreno side-by-side and indicated he was positive the woman in the photos was Nancy. Tostado also positively identified Moreno in court during the trial, testifying he was a "hundred percent" certain she was the person who met with him at the coffee shop and told him her name was Nancy.

## IV. *DISCOVERY VIOLATION CLAIM* (*DIGITAL* "*NANCY*" *IMAGES*)

In a related claim, Moreno contends the prosecution violated its discovery obligations under *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194] (*Brady*) and committed misconduct by "dumping" the RCFL CD on her trial counsel, Resnick, and "failing to specifically identify the fact there was a photo of another 'Nancy' in the [CD] (from the computer file of a separately charged co-conspirator [(Beritan)]." This claim is unavailing.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.)

"'There are three components of a true *Brady* violation: [(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is

54

impeaching; [(2)] that evidence must have been *suppressed by the State, either willfully or inadvertently*; and [(3)] prejudice must have ensued.'" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*), italics added.)

Moreno's *Brady* violation claim fails because she has not, and cannot, satisfy all three *Brady* violation elements. Assuming the digital images of another "Nancy" stored on the CD seized from Beritan's computer were exculpatory, there is no evidence the prosecution suppressed this evidence. The California Supreme Court has explained that "[a]lthough the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for [her]." (*Salazar, supra,* 35 Cal.4th at pp. 1048-1049.) "If the material evidence is *in a defendant's possession or is available to a defendant through the exercise of due diligence*, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence. [Citations.] Accordingly, evidence is not suppressed unless the defendant was actually unaware of it and *could not have discovered it* '"*by the exercise of reasonable diligence*."'" (*Salazar, supra,* 35 Cal.4th at p. 1049.)

Here—as discussed, *ante*, in connection with Moreno's unavailing claim that the court erroneously denied her motion for a new trial—the record shows the prosecution provided to Resnick during pretrial discovery the CD containing the images of another "Nancy" stored in the computer seized from Beritan. Thus, the record shows the CD and the images were in the possession of the defense before trial. We have already concluded Moreno's first counsel, Resnick, could have located the images through the exercise of

reasonable diligence. Moreno has failed to show the prosecution violated its *Brady* discovery obligations regarding the digital Nancy images in question because she has not shown, and cannot establish, the prosecution suppressed those images. (See *Salazar, supra,* 35 Cal.4th at pp. 1043.) Moreno's *Brady*-violation claim is without merit.

## V. *10 ADDITIONAL CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL*

In her supplemental appellant's opening brief, Moreno asserts 10 claims that her trial counsel, Resnick, provided prejudicially ineffective assistance. These claims are all unavailing.

### A. *Applicable Legal Principles*

As already discussed, to establish a denial of the right to effective assistance of counsel, a defendant must show (1) his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant, that is, there is reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, 466 U.S. at p. 694; *Ledesma*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

*Strickland* explained that "[j]udicial scrutiny of counsel's performance must be *highly deferential* [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland*, *supra*, 466 U.S. at p. 689,

56

italics added.)  Thus, *Strickland* explained, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  (*Ibid.*)

"'When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation.'"  (*People v. Kelly* (1992) 1 Cal.4th 495, 520 (*Kelly*).)  "A reviewing court will not second-guess trial counsel's reasonable tactical decisions."  (*Ibid*.)

B.  *Moreno's Ineffective-Assistance-of-Counsel Claims*

1.  *Resnick's failure to renew in limine Moreno's motion to suppress Tostado's "tainted" pretrial identification of Moreno*

Moreno contends Resnick rendered ineffective assistance of counsel when she failed to renew during in limine proceedings her motion to suppress Tostado's pretrial identification of her that she claims resulted in his "tainted" identification of her in court during trial.  This contention is unavailing.

a. *Background*

i. *Moreno's motions to suppress the identification evidence and dismiss the charges*

As Moreno's trial counsel, Resnick filed a pretrial motion under sections 1538.5 and 939.6, subdivision (b),[14] to suppress evidence that Moreno had been identified

---

14    With exceptions not applicable here, section 939.6, subdivision (b) provides: "[T]he grand jury shall not receive any evidence except that which would be admissible over objection at the trial of a criminal action, but the fact that evidence that would have

pretrial as the woman who had lured Tostado to his armed kidnappers inside the Point Dume Court residence. Resnick argued the transcript of the grand jury proceedings suggested that Tostado's and cooperating witness Guillermo Moreno's photographic identifications of her were fundamentally unfair. Resnick further asserted the evidence of Tostado's and Guillermo Moreno's identifications "[did] not pass constitutional muster" and should be suppressed.

Resnick also filed a companion motion to dismiss the charges against Moreno in the consolidated indictment, arguing the evidence was insufficient to support the charges against Moreno because Tostado's photographic identification of her was "constitutionally defective" and "the entire prosecution case [was] rendered insufficient."

In its written opposition to both motions, the prosecution argued that a motion to suppress under section 1538.5 was "not the proper legal mechanism to challenge the constitutional validity of a photographic identification procedure" because the evidence regarding the pretrial identification of Moreno was not obtained as the result of a search and seizure. The prosecution also argued there was no basis to dismiss the charges against Moreno because "the People presented substantial evidence of [Moreno's] identification well beyond the applicable evidentiary standard" and "the photographic identification procedures were neither unconstitutional nor improperly admitted into evidence during the Grand Jury proceedings."

---

been excluded at trial was received by the grand jury does not render the indictment void where sufficient competent evidence to support the indictment was received by the grand jury."

58

In the reply, Resnick argued that Moreno's motion to suppress cited as a basis for the requested suppression not only section 1538.5, but also the due process clauses of the federal and state constitutions and section 939.6, subdivision (b). Resnick acknowledged it was "clear" that District Attorney Investigator Marco Mercado, who conducted the photographic identification procedures, had "admonished [Tostado] before he looked at the pictures." Resnick asserted the identification procedures were "unnecessarily suggestive" and "[did] not pass constitutional muster" because Mercado asked Tostado and Guillermo Moreno to look at more pictures, including pictures of defendant Moreno, after they initially identified another woman (Sayra Noriega), which was "tantamount to a nonverbal cue that their identifications of [Noriega] were erroneous." Resnick further asserted that Tostado's identification testimony at the grand jury proceeding lacked reliability for the same reasons. Resnick attached copies of the photographs to Moreno's reply papers.

Following oral arguments at the hearing on Moreno's motions, the court denied her motion to suppress the pretrial identification evidence without prejudice to its renewal as an in limine motion, and it denied her motion to dismiss the charges against her to the extent it was based on her claim the photographic identification procedures were unconstitutionally suggestive.

Regarding the motion to suppress, the court found that because the motion was based on an attack on the identification of Moreno by witnesses, it did not raise a search and seizure issue under section 1538.5 and, thus, "the nature of the motion [was] misplaced to that extent." The court also found the motion was not a correct motion to

59

the extent it was brought under section 939.6, subdivision (b). The court told Resnick the appropriate resolution of the motion was to deny it "without prejudice to [its renewal] as an in limine motion before trial to address the general issues that are contained in [her] initial moving papers."

Regarding Moreno's motion to dismiss the charges, the court framed the issue of the claimed constitutional infirmity of the identification process as being whether the conduct of law enforcement was "so unfair or improper as to rise to a constitutional infirmity that would result in a dismissal of the indictment against [Moreno] as being unfairly suggestive and not in such a fashion as to be a fair method of identifying or attempting to identify [her]." Indicating it had reviewed relevant portions of the transcript of the grand jury proceeding, the court found there was "nothing illegal or improper about [law enforcement's use of] a single photo identification process" and nothing in the grand jury testimony indicated the identification procedure was "unduly suggestive and/or unnecessary so as to defeat the identification ultimately of [Moreno]." The court also found the grand jury testimony did not indicate law enforcement had engaged in any misconduct or deception. The court stated that Moreno's attacks on the photographic identification process in this case "go to the weight of the evidence rather than the constitutional . . . permissibility of the evidence."

ii. *Moreno's motion for a new trial*

In Moreno's motion for a new trial, which was filed by her new counsel, Comeau, Moreno claimed Resnick rendered constitutionally ineffective assistance by failing to renew, in limine, the challenge to Tostado's pretrial identification made in Moreno's

60

motions to suppress the identification evidence and dismiss the charges. Without discussing the facts of the case, she claimed an Evidence Code section 402 hearing should have been held regarding the identification, and Resnick's failure to request such a hearing "[wa]s [ineffective assistance of counsel] and require[d] reversal."

In his written opposition, the prosecutor argued Resnick made a reasonable tactical decision to forgo a motion in limine in favor of attempting to discredit Tostado through cross-examination. The prosecutor also argued a motion in limine to exclude the pretrial identification would have been futile because the procedures used during the pretrial identification of Moreno were not impermissibly suggestive. The prosecutor also asserted the evidence showed the prosecution's investigator, Mercado, "did not say anything to [Tostado] to indicate [Tostado] correctly identified anyone," and Mercado "admonished [Tostado] that just because he was being shown photos, it [did] not mean there [was] someone in custody or guilty, and that it [was] just as important to free innocent people as it [was] to identify those who [were] guilty." The prosecutor further argued that even if the court had granted such a motion, the People had "presented evidence that corroborated the fact that [Moreno] was in fact the Nancy who lured [Tostado] to his captors," and exclusion of the pretrial identification evidence would not have changed the outcome of the case.

In her reply, Moreno claimed the suggestiveness of the pretrial identification procedure was "plainly evident" and should have been explored during a "thorough pre-trial [Evidence Code section] 402 hearing."

The court denied Moreno's new trial motion. In a written order, the court explained that a defendant challenging the fairness of a photographic lineup has the burden of showing it was so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process. The court found that even if the photographic identifications of Moreno should have been suppressed, there was no indication the result of the trial would have been different because Tostado identified Moreno as the lure both at the grand jury proceedings and in court during the trial.

b. *Legal principles*

i. *Ineffective assistance of counsel*

We have already set forth the legal principles governing appellate review of ineffective-assistance-of-counsel claims.

ii. *Pretrial identification procedures*

"A pretrial identification procedure violates a defendant's due process rights if it is so impermissibly suggestive that it creates a very substantial likelihood of irreparable misidentification." (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819, citing *Simmons v. United States* (1968) 390 U.S. 377, 384.) "The defendant bears the burden of proving unfairness 'as a 'demonstrable reality,' not just speculation." (*Contreras*, at p. 819.)

The threshold issue is whether the pretrial "identification procedure was unduly suggestive and unnecessary." (*People v. Alexander* (2010) 49 Cal.4th 846, 901 (*Alexander*).) If this threshold question is answered in the affirmative, the court must then determine whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the witness's opportunity

to view the offender at the time of the crime, the degree of the witness's attentiveness, the accuracy of the witness's prior description of the suspect, the level of certainty displayed at the identification, and the time elapsed between the crime and the identification.  (*Id*. at pp. 901-902.)  "Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." (*People v. Yeoman* (2003) 31 Cal.4th 93, 125; accord, *Alexander*, *supra*, 49 Cal.4th at p. 901.)

"We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive."  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943; accord, *Alexander*, *supra*, 49 Cal.4th at p. 902.)

c. *Analysis*

Applying a highly deferential standard of scrutiny and indulging a strong presumption that Resnick's performance fell within the wide range of reasonable professional assistance, as we must (*Strickland*, *supra*, 466 U.S. at p. 689), we reject Moreno's ineffective-assistance-of-counsel claim because Resnick's decision not to renew in limine Moreno's motion to suppress the evidence of Tostado's pretrial identification of her was a reasonable tactical decision this court will not second-guess.  (See *Kelly*, *supra*, 1 Cal.4th at p. 520.)

Counsel is not ineffective for failing to bring a motion where such action would be futile.  (*People v. Hines* (1997) 15 Cal.4th 997, 1038, fn. 5.)

63

Here, in lieu of renewing in limine Moreno's suppression motion that the court had denied without prejudice, Resnick decided to attempt to discredit Tostado through cross-examination at trial. This decision was a sound trial tactic because in denying Moreno's companion motion to dismiss the charges against her based on her claim the pretrial identification process was unduly suggestive and unfair, the court told Resnick that Moreno's attacks on the pretrial photographic identification process in this case "go to the weight of the evidence rather than the constitutional . . . permissibility of the evidence." The court reiterated this point, telling Resnick that Moreno's arguments "attacking" that process "appear[ed] to go to the weight of the identification rather than the admissibility of the identification." Furthermore, after indicating it had reviewed relevant portions of the transcript of the grand jury proceeding, the court found there was "nothing illegal or improper about [law enforcement's use of] a single photo identification process" and nothing in the grand jury testimony indicated the identification procedure was "unduly suggestive and/or unnecessary so as to defeat the identification ultimately of [Moreno]." The court also found the grand jury testimony did not indicate law enforcement had engaged in any misconduct or deception.

At trial Resnick thoroughly cross-examined Tostado about his identification of Moreno as the "Nancy" who lured him to the Los Palillos kidnappers waiting for him inside the safe house. For example, Resnick elicited testimony from Tostado that he thought it would be "strange" for any of the kidnappers to use the real name of the person who brought Tostado to the residence. Tostado acknowledged that when the prosecution's investigator, Mercado, showed him the photo of Noriega, he thought she

64

might be Nancy because the shape of her head and hair color were almost the same. Resnick elicited testimony from Tostado showing the amount of time he spent with Moreno was relatively brief. She asked Tostado about the fact that he had described Moreno as having long hair, but he had also said her hair was short.

In addition to thoroughly cross-examining Tostado about his identification of Moreno, Resnick called Dr. Eisen, an expert on eyewitness identification, to the stand. As discussed, *ante*, in the factual background, Resnick also presented the testimony of alibi witnesses.

Because Resnick's decision to not renew Moreno's motion to suppress was a reasonable trial tactic, we will not second-guess her decision. (See *Kelly*, *supra*, 1 Cal.4th at p. 520.) As sound tactical reasons supported that decision, we conclude Moreno has failed to meet her threshold burden of demonstrating Resnick's performance fell below an objective standard of reasonableness under prevailing professional norms.

2. *Resnick's failure to object to admission of the 24-Hour Fitness records as business records*

Moreno contends Resnick prejudicially rendered ineffective assistance of counsel when she failed to object to the introduction of records of the Bonita 24-Hour Fitness gym showing she became a member of, and went to, the gym during the period of time in which, according to kidnapping victim Vasquez's testimony, she befriended him there. Moreno asserts Resnick should have brought an in limine motion to exclude the testimony of the 24-Hour Fitness custodian of records, Frank Lucatuorto, because he had no personal knowledge about the gym records and was not competent to lay a foundation

65

for admission of the records under the business records exception to the hearsay rule and because he "should not have been permitted to testify about their contents." Moreno's contention and assertions are unavailing.

a. *Background*

In her motion for a new trial, Moreno claimed the 24-Hour Fitness records the court admitted in evidence were inadmissible hearsay and Resnick provided ineffective assistance by failing to object in limine to the introduction of those records and to the testimony of 24-Hour Fitness's loss prevention officer, Lucatuorto, about the application Moreno completed and signed to become a member of the gym, and about the procedures the gym used to make sure others did not use a member's identification to access the facilities. Moreno claimed Lucatuorto was not competent to lay a foundation for admission of the records, and he should not have been permitted to testify because he was not the custodian of records and had no personal knowledge about the membership application in question.

In its written opposition, the prosecution argued there were no grounds for an objection, and thus Resnick did not provide ineffective assistance by failing to object, because Lucatuorto laid a foundation for introduction of the documents as business records under Evidence Code section 1271.

In her reply, Moreno complained that Lucatuorto failed to provide more details about his qualifications to testify as 24-Hour Fitness's custodian of records and was not competent to lay a foundation for admission of the 24-Hour Fitness application as a

66

business record because he was not present when the gym membership application was prepared and had no personal knowledge about its preparation.

The court denied Moreno's new trial motion. In its written order, the court found that Lucatuorto's testimony established he was the custodian of records, and he was a "qualified witness" within the meaning of Evidence Code section 1271, subdivision (c), because he had personal knowledge of the company's procedures due to his 13-year employment with 24-Hour Fitness as a loss prevention officer. The court also found Moreno had failed to demonstrate either deficient performance or prejudice in Resnick's failure to object.

b. *Legal principles*

The business records exception to the hearsay rule is codified in Evidence Code section 1271, which provides:

> "Evidence of a writing made as a record of an act, condition, or event is not inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) *The custodian or other qualified witness testifies to its identity and the mode of its preparation*; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Italics added.)

The purpose of the business records exception to the hearsay rule is "to eliminate the necessity of calling each witness and to substitute the record of the transaction instead." (*People v. Crosslin* (1967) 251 Cal.App.2d 968, 975.)

"[A]ny 'qualified witness' who is knowledgeable about the documents may lay the foundation for introduction of business records—the witness need not be the custodian or

67

the person who created the record."  (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 324 (*Jazayeri*), citing *People v. Hovarter* (2008) 44 Cal.4th 983, 1012; see Evid. Code, § 1271, subd. (c).)

        c. *Analysis*

        Moreno's ineffective-assistance-of counsel-claim is primarily premised on her contention that 24-Hour Fitness's loss prevention officer was not competent to lay a foundation for admission of the records under the business records exception to the hearsay rule because he had no personal knowledge about the preparation of gym records in question (discussed, *post*).  In support of this contention Moreno asserts "[t]he only competent witness from 24 Hour Fitness that could lay a foundation for the [gym records] and provide evidence about the circumstances surrounding the application by 'Nancy Mendoza,' was the front desk clerk or the membership counselor" at the Bonita 24-Hour Fitness gym.  Moreno's contention is without merit.

        In order to introduce the gym records into evidence under the business records exception to the hearsay rule, the prosecution was required to present testimony by the custodian of records or "other qualified witness" regarding the "identity and the mode of . . . preparation" of those records.  (Evid. Code, § 1271, subd. (c).)

        As already discussed, "any 'qualified witness' who is knowledgeable about the documents may lay the foundation for introduction of business records─*the witness need not be the custodian or the person who created the record*."  (*Jazayeri*, *supra*, 174 Cal.App.4th at p. 324, italics added.)

Here, Lucatuorto's testimony established he was a "qualified witness" within the meaning of Evidence Code section 1271, subdivision (c), who, despite his lack of personal knowledge of the preparation of the gym membership application in question, was competent to lay a foundation for admission of the 24-Hour Fitness gym records under the business records exception to the hearsay rule by testifying to the "identity and the mode of . . . preparation" (*ibid.*) of those records.

Lucatuorto testified he was the regional loss prevention manager for 24-Hour Fitness. His duties included testifying in California superior courts as the custodian of records for the company, and he had previously testified in that capacity. His responsibilities covered 90 facilities in California and Arizona, and he had visited them many times.

Lucatuorto stated he had visited the 24-Hour Fitness near H Street in Bonita and was familiar with the process of registering a new member there. He explained that process. The prospective member goes to the front desk and speaks to a service representative at the front desk, who gives the person a liability form to fill out in case the person is injured while looking at the club. The person is required to present a valid government-issued photo identification to validate his or her identity and the information that was put on the liability form. No one is allowed access to the gym without a valid photo identification. In the south San Diego area where the Bonita 24-Hour Fitness gym is located, it is common practice to accept identifications issued by the Mexican government, such as a passport, a driver's license, or a voter registration card, provided a photograph is attached to the identification with the person's biographical information.

69

Once the foregoing process is complete, a membership counselor accompanies the person on a tour of the facility and provides information about membership pricing. The majority of the membership counselors hired in South Bay San Diego are bilingual. If the person wants to join following the tour, the membership counselor obtains the person's place of residence, date of birth, and phone number. There are two membership options: a month-to-month membership and a limited-term membership. In either case, the member must sign and date a membership agreement containing the member's biographical information, the terms of which are explained to the member. Both the member and an employee are required to sign the agreement. The member is given a check-in sheet, which informs the member he or she must bring an identification card each time they check in at the facility.

Lucatuorto identified court's exhibit 35 as a document that included a standard 24-Hour Fitness club membership agreement in use around January 2007. It was a contract containing a member's biographical information, her signature, and the signature of the employee signing the member up. The biographical information consisted of a first name, last name, address, date of birth, gender, and phone number. This agreement was for club No. 084, the one in Bonita, and was for a Nancy Mendoza, 1785 Simpatico Court, San Diego, CA 92154, with the phone number (619) 946-0467. Lucatuorto testified that this agreement was a record kept in the regular course of business for 24-Hour Fitness, entered into the computer system at the time of the event, and regularly relied upon by 24-Hour Fitness in conducting its business.

70

Lucatuorto identified exhibit 36 as a renewal contract for member Jorge Garcia Vasquez. Lucatuorto also identified Exhibits I-253 through I-255 as computerized printouts showing the times and dates of club usage by Moreno and Vazquez. Lucatuorto testified that usage records showed Moreno and Vasquez entered and exited the gym at about the same time on January 18, 19, 23, 30 and 31, 2007. He explained that the gym usage information is captured and catalogued every time a membership card is scanned at the front desk. These exhibits were computer printouts of that data, and were maintained in the same fashion as the club's other business records.

Lucatuorto's foregoing testimony established he was a qualified witness (Evid. Code, § 1271, subd. (c)). In light of Lucatuorto's extensive knowledge of the procedures used by 24-Hour Fitness for maintaining its records, his position and experience as a loss prevention manager, and his experience testifying as custodian of records for 24-Hour Fitness, we conclude any objection by Resnick to his qualifications and competency to lay a foundation for the admission of the records in question under the business records exception to hearsay rule would have been overruled. Thus, we also conclude Resnick did not provide ineffective assistance by failing to raise such objections or to object to admission of the 24-Hour Fitness records under the hearsay rule. (See *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."].)

In an ancillary claim, Moreno contends Lucatuorto should not have been permitted to testify about the contents of the 24-Hour Fitness records. In support of this claim, Moreno relies on Evidence Code section 1523, subdivision (a), which provides: "Except

71

as otherwise provided by statute, oral testimony is not admissible to prove the content of a writing." This claim is without merit. Lucatuorto's testimony was not admitted to "prove the content of a writing" within the meaning of Evidence Code 1523, subdivision (a); he identified and described the records for the purpose of laying a foundation for their admission under the business records exception to the hearsay rule. All of the documents at issue here were properly admitted into evidence, thereby satisfying the requirements of Evidence Code section 1523.

3. *Resnick's failure to object to admission of Comfort Inn and Southwest Airlines records*

Moreno next contends Resnick provided ineffective assistance of counsel by failing to object on hearsay and foundational grounds to the admission of Comfort Inn and Southwest Airlines business records. This contention is unavailing.

a. *Background*

The prosecution presented evidence that the drug-trafficking activities of Los Palillos gang members in San Diego extended into Kansas City. Investigator Mercado testified he received information that led him to believe Southwest Airlines records might contain evidence linking Moreno to the Los Palillos organization. He issued a subpoena to Southwest Airlines and reviewed the documents given to him pursuant to that subpoena. He received records of 56 flights between San Diego and Kansas City covering the time period from April 2005 through August 2006. Mercado testified that on August 27, 2006, a person using the name Nancy Mendoza flew from San Diego to Kansas City. On that flight she flew with Los Palillos members Guillermo Moreno,

72

Gerardo Lopez-Becerra, and Juan Estrada-Gonzalez. Two days later, on August 29, she flew back alone to San Diego from Kansas City.

The prosecution also presented evidence that among the items found in Estrada-Gonzalez's possession when he was arrested after Tostado's rescue, was a card key for room 301 at the Comfort Inn in National City. Law enforcement agents went to the Comfort Inn and eventually obtained computer printouts for guests registered there between June 14, 2007 and June 18, 2007. She presented a Mexican identification card with no date of birth. A man paid cash for the room.

A front desk agent at the Comfort Inn on Plaza Boulevard in National City testified for the prosecution as a foundational witness. She testified that to rent a room, a guest was required to present a photo identification and give a deposit. A guest could not check in without a photo identification. The front desk agent would also get the guest's first and last name and address and would ask the guest how many nights she was staying. If the guest paid in advance, she could leave without checking out. The information was entered into a computer and could be accessed at a later date. In June 2007 she pulled up the computerized information for an FBI agent. The Comfort Inn records were admitted into evidence as exhibit 37.

In her motion for new trial, Moreno claimed Resnick provided ineffective assistance of counsel by failing to object to the admission of the Comfort Inn and Southwest Airlines records. She asserted no foundation was laid for their introduction, and they were inadmissible and "wholly unreliable" hearsay.

In its opposition, the prosecution argued the records were business records, the People had laid the proper foundation, and there was no reasonable probability the court would have sustained an objection had one been made.

In denying the new trial motion, the court rejected Moreno's ineffective assistance of counsel claim. The court stated that "[b]eyond [Moreno's] conclusory allegations, [she] fail[ed] to specify why these documents were inadmissible" and, thus "she ha[d] not shown deficient performance or prejudice."

b. *Analysis*

As already discussed, to prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) her counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland*, *supra*, 466 U.S. at pp. 687-688; *Ledesma*, *supra*, 43 Cal.3d at pp. 216-217.)

We conclude Moreno has failed to meet her burden of demonstrating that (1) Resnick provided ineffective assistance of counsel by failing to object on hearsay and foundational grounds to the admission of the Comfort Inn and Southwest Airlines business records, and (2) assuming Resnick's performance was deficient, Moreno suffered prejudice. In her supplemental opening brief, in which she raises her ineffective-assistance-of-counsel claim, Moreno simply ignores the testimony of the Comfort Inn's front desk agent (discussed, *ante*) that provided the foundational basis for admission of the Comfort Inn records as business records under the business records exception to the hearsay rule in Evidence Code section 1271 (discussed, *ante*).

74

Even if we were to assume the Comfort Inn and Southwest Airlines records were inadmissible and Resnick should have objected to their admission, Moreno's claims of error are unavailing because she makes no attempt to demonstrate she suffered prejudice as a result of Resnick's claimed ineffective assistance in failing to object to those records. To show prejudice, a defendant claiming ineffective assistance of counsel must show a reasonable probability she would have received a more favorable result had her counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) Here, Moreno has made no attempt to do so. Were it necessary to review here the strong evidence of Moreno's guilt, we would conclude she has failed to meet her burden of showing she would have received a more favorable result had Resnick objected to admission of the records.

4. *Resnick's failure to call her retained handwriting expert as a witness*

In a related claim, Moreno contends Resnick rendered ineffective assistance of counsel by failing to call her retained handwriting expert, Manny Gonzalez of Alliance Forensic Services, as a witness during Moreno's case-in-chief after the prosecution presented the testimony of Lucatuorto, 24-Hour Fitness's loss prevention officer. Moreno's contention is unavailing.

Moreno asserts she hired her handwriting expert "to determine whether or not the 'writer of the Nancy Mendoza signature' on the membership agreement at the 24 Hour Fitness [gym] was [hers]." She acknowledges her expert "could not determine whether or not the questioned signatures were written by [her]."

75

In his report, the expert indicated he was hired to analyze Moreno's exemplar signatures and the Nancy Mendoza signatures on a 24-Hour Fitness membership agreement and a 24-Hour Fitness new member orientation checklist, both of which were dated January 15, 2007, and to determine whether Moreno wrote the signatures on those 24-Hour Fitness documents. In the "Results of Analysis" section of his report, the expert stated:

> "I could not determine whether or not the questioned 'signatures' [on the two 24-Hour Fitness documents] were written by your client— Nancy Michelle Mendoza Moreno—the [exemplar signatures] writer. While there are some sparse handwriting features in common between Moreno's exemplar signatures and the questioned 'signatures,' there are also features which cannot be explained with your client's current exemplars. Neither category of features (similarities or differences) outweighs the other for the purpose of providing you with a leaning as to the issue of genuineness or non-genuineness."

As already discussed, "[a] reviewing court will not second-guess trial counsel's reasonable tactical decisions." (*Kelly*, *supra*, 1 Cal.4th at p. 520.)

Here, Resnick's decision to not present the testimony of a retained handwriting expert who could not determine whether Moreno was the author of the signatures on the 24-Hour Fitness membership agreement and new member orientation checklist was a reasonable tactical decision within professional norms that we will not second-guess. (See *Kelly*, *supra*, 1 Cal.4th at p. 520.) As we discussed, *ante*, Resnick reasonably chose potentially more fruitful means of attacking the prosecution's identification evidence by presenting the testimony of alibi witnesses and an expert on eyewitness identification

76

(Dr. Eisen), and by vigorously cross-examining the prosecution's witnesses.

Accordingly, we conclude Moreno's ineffective-assistance-of counsel claim fails.

     5. *Resnick's failure to request a pinpoint instruction on third party liability*

Asserting "[t]he theory of defense was misidentification and third party liability," Moreno contends Resnick provided ineffective assistance of counsel by failing to request a special pinpoint instruction on third party liability. She provides a sample instruction she thinks Resnick should have requested.[15] Moreno's contention is unavailing.

A trial court is required to instruct jurors on general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) A defendant may be entitled, upon request, to an instruction that pinpoints the theory of the defense case. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142.) In appropriate circumstances a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by relating the reasonable doubt standard of proof to particular elements of a charged crime. (*People v. Moon* (2005) 37 Cal.4th 1, 30, 32.)

However, "[w]hen examining whether a court erred in not giving a pinpoint instruction, we are mindful of the general rule that 'a trial court may properly refuse an

---

15    "The defendant contends that another person committed the charged offense. The burden of proving that another person committed the charged offense does not rest upon the defendant. To establish the defendant's guilt[,] the prosecution must prove beyond a reasonable doubt that the defendant was the person who committed the crime charged. The defendant's contention that she did not participate in the crime and that another person committed it is simply a denial of facts essential to the state's case. [¶] Therefore, upon considering all the evidence in this case, including the evidence with respect to another person committing the charged offense, if you have a reasonable doubt as to the defendant's participation in the crime charged, you must find her not guilty."

77

instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].'" (*People v. Mackey* (2015) 233 Cal.App.4th 32, 111, quoting *People v. Moon*, *supra,* 37 Cal.4th at p. 30.)

In *People v. Hartsch* (2010) 49 Cal.4th 472 (*Hartsch*), the Supreme Court explained that third party culpability instructions "add little to the standard instruction on reasonable doubt," and that "even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Id*. at p. 504.) The *Hartsch* court observed that "[i]t is hardly a difficult concept for the jury to grasp that acquittal is required if there is a reasonable doubt as to whether someone else committed the charged crimes." (*Ibid*.)

Here, as Moreno points out, the theory of her defense was misidentification and third party liability. The Attorney General asserts, and Moreno does not dispute, that Resnick based her entire closing argument on the defense theory that someone else committed the charged crimes Moreno allegedly committed. The court gave a standard reasonable doubt instruction (CALCRIM No. 220) that the prosecution was required to prove its case beyond a reasonable doubt, and that in deciding whether the prosecution had proved its case beyond a reasonable doubt, the jurors were required to "impartially compare and consider all of the evidence that was received throughout the entire trial"

78

and find Moreno not guilty "[u]nless the evidence prove[d] [her] guilty beyond a reasonable doubt."

The court also instructed the jurors under CALCRIM No. 315 (Eyewitness Identification) that "[t]he People ha[d] the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime," and that "[i]f the People ha[d] not met this burden, [they] must find the defendant not guilty."

"It [was] hardly a difficult concept for the jury to grasp that acquittal [was] required if there [was] a reasonable doubt as to whether someone else committed the charged crimes."  (*Hartsch*, *supra*, 49 Cal.4th at p. 504.)  Because Resnick's closing argument and the court's instructions clearly informed the jury that it was the prosecution's burden to prove its case beyond a reasonable doubt and that the jury could not convict Moreno if there was a reasonable doubt as to whether someone else committed the charged offenses, we conclude the court would not have abused its discretion in denying Resnick's request for the pinpoint instruction now suggested by Moreno had Resnick made such a request.  Accordingly, we also conclude Moreno has failed to meet her burden of showing that Resnick's performance in failing to request such a pinpoint instruction was below an objective standard of reasonableness under prevailing professional norms or that it prejudiced Moreno.

*6. Resnick's failure to move for bifurcation of the gang enhancement allegation, and Moreno's claims of evidentiary error regarding the prosecution's gang evidence*

Moreno's next contention or contentions are not entirely clear. Rule 8.204(a)(1)(B) of the California Rules of Court[16] provides that "[e]ach brief must . . . [s]*tate each point under a separate heading or subheading summarizing the point*, and support each point by argument and, if possible, by citation of authority." (Italics added.)

Here, Moreno has substantially failed to comply with rule 8.204(a)(1)(B). The heading in her supplemental opening brief, submitted by her appellate counsel Elizabeth Comeau, states: "Erroneous Admission of Cumulative and Prejudicial Gang Evidence, Irrelevant and Inflammatory Evidence, and Testimonial and Other Inadmissible Hearsay Was an Abuse of the Trial Court's Discretion Which Violated Appellant's Constitutional Rights." This broadly worded heading encompasses numerous claims of evidentiary error regarding gang evidence. The portion of Moreno's supplemental opening brief that appears under this heading is 27 pages in length. At page 61 of her brief, Moreno provides one subheading that summarizes a specific point and asserts an ineffective-assistance-of-counsel claim: "D. Attorney Resnick Prejudiced Appellant's Right to a Fair Trial When She Failed to Move for Bifurcation of the Gang Enhancement." This claim is not mentioned in her heading.

Following her arguments regarding this point, Moreno provides four additional subheadings, none of which states a specific point in compliance with rule

---

16 All further rule references are to the California Rules of Court.

8.204(a)(1)(B): (1) "E. Discussion − FBI Agent Giboney"; (2) "F. Discussion − Det. Ron Newquist"!;(SAOB 71)! (3) "G. Discussion − DAI Marco Mercado"; and (4) "H. "Discussion − Steven Campman, M.E. (Murder Autopsy Evidence)."

Moreno's ineffective-assistance-of-counsel claim and her remaining claims are unavailing.

a. *Background*

i. *Charges*

As pertinent here, the consolidated indictment charged Moreno with one count of conspiracy to commit kidnapping for ransom (count 1; victim: Tostado), one count of aggravated kidnapping for ransom (count 2; victim: Tostado), and two counts of nonaggravated kidnapping for ransom (counts 3 & 4; victims: Eric (Balitas) Nunez Ochoa & Vasquez, respectively). The indictment also alleged Moreno committed each of the foregoing charged offenses for the benefit of, in association with, or at the direction of a criminal street gang (§ 186.22, subd. (b)(1)). The jury convicted Moreno of counts 1, 2, and 4; found to be true the gang enhancement allegations related to those three counts; and found Moreno not guilty of count 3.

ii. *In limine motions and rulings*

As part of his trial brief, the prosecutor brought a motion in limine asking the court to permit the prosecution to present gang evidence, including expert testimony, on the issues of motive and intent, and to prove the gang allegations and the existence of the alleged conspiracy. The prosecutor argued the gang evidence was extremely probative on the issues of motive, intent, and identity because such evidence "shows close

81

association with similar motivations of one [gang] member with another." Also, the prosecution was required to present expert testimony to meet its burden of proving the truth of the gang enhancement allegations beyond a reasonable doubt. Here, that testimony would be provided by FBI Agent Giboney, Investigator Mercado, and San Diego Police Detective Ron Newquist. The prosecutor informed the court that at the time of the June 2007 raid on the Point Dume Court residence during the rescue of Tostado, law enforcement had not yet documented Los Palillos as a criminal street gang. Law enforcement did not know of the gang's existence until Spring 2007. The prosecutor argued he intended to present evidence of five predicate offenses and advised the court he would need to prove Moreno had the specific intent to promote, further, or assist criminal conduct by members of the Los Palillos gang. The prosecutor also explained that similar kidnappings for ransom previously committed by Los Palillos were important to show modus operandi, which is especially important in a gang case.

Moreno, through Resnick, moved in limine to limit the gang evidence the prosecution could introduce at trial. She argued that although an expert could be asked hypothetical questions, the expert could not give an opinion on a defendant's knowledge and specific intent. Resnick asked the court in the exercise of discretion under Evidence Code section 352 to limit the number of predicate offenses and the details surrounding those offenses. Resnick also asked the court to exclude gang evidence that was irrelevant and unduly prejudicial. Resnick also moved to exclude or limit evidence regarding murders committed by members of Los Palillos, noting that Moreno was not charged

82

with murder and some of the murders occurred before she became involved with the gang in 2006. She urged that details regarding the murders be kept to a minimum.

At a hearing on the motions, the court stated its tentative ruling was to grant the defense in limine motion in part. The court indicated that because Moreno did not participate in the murders, describing them might be prejudicial. Thus, there might be a basis for excluding the details under Evidence Code section 352. The court found, however, that the expert testimony proposed by the prosecution was admissible. In addition, the expert could be asked hypothetical questions designed to show Moreno's knowledge and intent. The court would grant Resnick's request to limit the evidence of predicate offenses by excluding the homicides.

Addressing the People's in limine motion, the court tentatively ruled it would not exclude gang evidence in its entirety, but would entertain objections to specific questions if Resnick felt they were objectionable. The court found admissible testimony regarding kidnappings for ransom where members of Los Palillos wore police uniforms, tased victims, brought them to a house, and demanded money from family members. The court explained that while such evidence was "pretty time-consuming," it was not overly so, and "the probative value [was] high, the similarities [were] numerous, and fundamental fairness would allow the People to—use that type of evidence."

In response to the court's tentative rulings, the prosecutor stated the defense had requested a limitation on evidence of the details of murders committed by Los Palillos, "not a complete exclusion of the murders." The prosecutor argued the murder evidence should not be excluded in its entirety because it was necessary to prove the gang

83

allegation, and it was evidence of modus operandi, common plan or scheme, conspiracy, aiding and abetting, and Moreno's intent. In addition, the gang expert would testify to a pattern of criminal gang activity and about the primary activities of the gang. The prosecutor argued that Los Palillos was "a kidnapping and murder" gang, and part of the gang's modus operandi included killing victims.

The court asked the prosecutor how he proposed presenting the murder evidence without getting specific as to the manner and mode of the murders. The prosecutor responded that the prosecution would not go through every murder. Most of the testimony would come from Carlos Pena, who was cooperating with the prosecution. The prosecution would ask Pena about how he became involved with Los Palillos and what he did for them. Pena would testify, for example, that the first murder victim was lured into a drug transaction, he was murdered, and his body was left in the street. The prosecutor added he had to prove, with regard to the Tostado kidnapping, that Tostado suffered great bodily harm, Tasers were found at the Point Dume Court residence, and there were Taser wounds on some of the bodies of the murder victims. All of the crimes were connected. Also, Tostado and Vasquez were held in houses where the murders were committed. The prosecutor argued the evidence was was circumstantial evidence proving modus operandi, conspiracy, aiding and abetting, and common plan or scheme. Noting that Pena's cooperation agreement included his admission that he participated in murders, the prosecutor asked how would he "be cross-examined . . . .without [his] discussing the fact [he] participated in murders?"

Resnick responded that one of her primary concerns was testimony about the disposal of bodies through dissolution in muriatic acid because it was unrealistic to expect such evidence not to prejudice a jury. The prosecutor acknowledged that photographs of the bodies should not be admitted. He also argued the testimony would not prejudice the jury against Moreno, who was merely used to lure the victims to their kidnappers.

The court stated it would be unfair to make the defense "spend . . . half [its] closing argument removing [Moreno] from the conduct of Los Palillos." The court, however, modified its tentative ruling by permitting Pena and the gang experts to testify about homicides but ruled "the testimony of the murders be generic." The court stated it would permit the prosecution to show that "the acts—of the Los Palillos gang through its members included the murder of numerous individuals at different times and places and during the time that they were kidnap victims." The court indicated that anything more would be precluded under Evidence Code section 352.

iii. *Gang evidence admitted at trial*

At trial, the prosecution presented the gang evidence set forth, *ante*, in the factual background.

iv. *Moreno's motion for a new trial*

In her motion for a new trial, Moreno claimed that Resnick "failed to zealously advocate for her client" by failing to object to "a multitude of evidence on [Evidence Code section] 352 grounds." She also claimed the testimony of the prosecution's gang experts "consisted of inadmissible hearsay, violated [her] Sixth Amendment rights, and

85

was . . . more prejudicial than probative." Moreno selected numerous portions of testimony from various witnesses, faulted the prosecutor for presenting them, and criticized Resnick for not objecting to their introduction. Moreno separately summarized some of Agent Giboney's testimony and claimed most of Giboney's three days of testimony "was a waste of judicial resources."

In its written opposition to the motion, the prosecution argued the court correctly decided what evidence was admissible at trial, and Moreno's assertion a series of errors occurred throughout the trial was unsupported by legal authority. The prosecution argued she was "rehash[ing]" arguments made either in the motions in limine or during the trial upon which the court had already ruled. The testimony was relevant, and the court was in the best position to preclude any testimony presented in violation of its in limine rulings and to do balancing under Evidence Code section 352. The prosecution also argued that any hearsay was offered not for its truth, but rather to qualify the expert witnesses as experts and explain the bases for their opinions, and that the court had instructed the jury that the testimony was to be considered for the limited purpose of proving the gang allegations and not for any other purpose.

The court denied Moreno's new trial motion. The court rejected Moreno's general claim that Resnick failed to zealously advocate for her, finding that Moreno had failed to "point to specific instances of meritorious objections [Resnick] should have made that would have that would have made a difference in the outcome." The court found that under established law experts could rely on hearsay in forming their opinions and that none of the statements about which Moreno complained was testimonial or offered for

86

their truth. The court found the gang evidence was relevant and not unduly prejudicial, there was no authority for Moreno's assertion a gang expert could not define a "criminal street gang" and, even if he could not, the jury was instructed that its job was to determine the facts. Addressing Moreno's complaint about evidence concerning the relationship between Los Palillos and the Arellano-Felix Organization, the court indicated that even if this case was primarily about the identification of the woman who acted as the lure, the prosecution had to prove all of the elements of the offenses, including intent, as well as the gang enhancement.

Regarding Moreno's claim that testimony was admitted in violation of the court's in limine ruling that murders committed by Los Palillos could only be presented in a generic manner, the court stated it "did not, and does not, feel any of the testimony violated the court's in limine rulings." The court summarily rejected Moreno's "waste of judicial resources" argument, finding that Giboney's testimony was "neither irrelevant nor unduly prejudicial."

b. *Analysis*

A trial court has discretion to bifurcate gang enhancement allegations from the substantive charges. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).)

However, a gang enhancement allegation is different from a prior conviction allegation in that "[a] prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*Hernandez*, *supra*, 33 Cal.4th at p. 1048.) The

87

California Supreme explained in *Hernandez* that "less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation" (*ibid.*), and the trial court's discretion to deny bifurcation of a charged gang enhancement is broader than its discretion to admit gang evidence when the gang enhancement is not charged (*id*. at p. 1050). The *Hernandez* court also explained that "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (*Ibid.*) In exercising its discretion to grant or deny bifurcation of a trial on a gang enhancement allegation, the trial court may consider the countervailing factors of "increased expenditure of funds and judicial resources" that would result from bifurcation. (*Ibid*.)

Here, we conclude that even if Resnick had moved to bifurcate the trial on the gang enhancement allegation, the motion would have been denied. As discussed, *ante*, the court stated at the hearing on the parties' in limine motions that gang evidence, including testimony about the Los Palillos gang's other crimes, was important to show motive, intent, and modus operandi, and exclusion of such evidence would be fundamentally unfair to the prosecution. The court later reiterated these findings when, in denying Moreno's new trial motion, it stated, "Gang evidence was relevant to this case, but even if some of it should not have been admitted, it was not unduly prejudicial given the nature of the case." The court also noted the gang evidence was relevant to the issue of intent as well as the gang enhancement allegation. The court rejected Moreno's

assertion that some of the gang testimony was a "waste of judicial resources." In addition, the court was undoubtedly aware that increased judicial resources and jury time would have been spent unnecessarily hearing the same testimony twice, once to help prove Moreno had a motive to commit the charged crimes and a second time for purposes of reaching a verdict on the gang enhancement allegation. In sum, we conclude Moreno has failed to meet her burden of demonstrating Resnick provided ineffective assistance of counsel by failing to request bifurcation or that there was a reasonable probability Moreno would have obtained a more favorable outcome in the absence of any such ineffective assistance.

Regarding Moreno's claims of evidentiary error, the record shows Resnick had a valid tactical reason not to raise the numerous objections Moreno claims she should have asserted. The principal issues related to gang evidence were litigated in limine and, as shown by the court's written order denying Moreno's new trial motion, the court found the gang evidence was admissible and its introduction did not violate the limitations the court set in limine. Moreno's claim she was denied a fair trial is unavailing. Here, the gang evidence was relevant to prove the gang enhancement allegation, as well as to show a conspiracy to commit the charged crimes and Moreno's motive and intent in committing them.

7. *Resnick's failure to object to the modified version of CALCRIM No. 375 given to the jury*

Moreno contends Resnick should have objected to a modified version of CALCRlM No. 375 (Evidence of Charged Offenses to Prove Identity, Intent, Common

89

Plan, etc.) that the prosecution proposed and the court gave to the jury. Moreno further contends that as a result of Resnick's failure to object to that instruction, her constitutional rights to the presumption of innocence, proof beyond a reasonable doubt, due process, and a fair trial were violated. These contentions are unavailing.

a. *Background*

The prosecutor submitted a modified version of CALCRlM No. 375, which he referred to as proposed special instruction No. 3. The proposed instruction informed jurors that if they decided the prosecution had proved *beyond a reasonable doubt* that Moreno was a principal in the commission of one or more of the three charged kidnappings, they could consider her commission of that kidnapping or those kidnappings for the purpose of deciding whether (among other things) she "committed the other offenses" charged in this case, acted with the requisite intent as it related to the other charged offenses or allegations, had a motive to commit the other charged offenses, knew of the (Los Palillos) gang's criminal activities, or aided and abetted one or more of the charged offenses.

When the court mentioned CALCRIM No. 375 during the jury instructions conference, Resnick objected to it, stating: "[I]t sounds like my client was involved in other crimes but just not charged even the way it's worded. So I really don't want the instruction." Resnick told the court that if it gave the instruction, she wanted the court to substitute "perpetrators other than the defendant" or " other than Nancy Mendoza [Moreno]" in the place of "defendant."

90

The prosecutor responded that he wanted to substitute special instruction No. 3 for CALCRIM No. 375. He argued that under Evidence Code section 1101, subdivision (b) (discussed, *post*), evidence of prior and subsequent acts could be used to prove modus operandi. The prosecutor informed the court that in the proposed instruction he had changed the People's burden of proof from the one provided in the standard CALCRIM No. 375 instruction—proof by a preponderance of the evidence—to proof beyond a reasonable doubt.

The court stated it was inclined to grant the prosecutor's request for the modified instruction and asked Resnick whether the change in the burden of proof satisfied her concerns. Resnick replied she still had a problem with the language in paragraph 2 of the proposed instruction providing that if the People had proved beyond a reasonable doubt the defendant (Moreno) was a principal in the commission of one or more of the charged kidnappings, they could consider her commission of that kidnapping or those kidnappings for the purpose of deciding whether she "committed the other offenses." Resnick asked whether the term "other offenses" referred to the other kidnappings charged in this case. The prosecutor said, "Yes." The court added, "Specific to the charged offenses . . . against [Moreno]." Resnick responded, "Got it. Got it. All right. That's fine."

The court ruled it would deem CALCRlM No. 375 withdrawn and replaced by special instruction No. 3 (the modified version of CALCRIM No. 375), which it would give as requested by the prosecution.

91

Thereafter, the court instructed the jury with the modified version of CALCRIM

No. 375, which stated:

>"The People allege that the defendant was a principal in the
>commission of three Kidnappings for Ransom in this case.
>
>"*If you decide that the People have proved beyond a reasonable
>doubt that the defendant was in fact a principal in the commission of
>one or more of the charged Kidnappings for Ransom, you may, but
>are not required to, consider the defendant's commission of that
>offense for the purpose of deciding whether or not*:
>
>"*The defendant was the person who committed the other offenses in
>this case*; or
>
>"The defendant acted with the requisite intent as it relates to the
>other charges and allegations in this case; or
>
>"The defendant had a motive to commit the other charges and
>allegations in this case; or
>
>"The defendant knew of the gang's criminal activities alleged in this
>case; or
>
>"The defendant had a plan or scheme to commit the offenses alleged
>in this case; or
>
>"The defendant was a member of a conspiracy of one or more of the
>offenses alleged in this case; or
>
>"The defendant aided and abetted in one or more of the offenses
>alleged in this case.
>
>"In evaluating this evidence, consider the similarity or lack of
>similarity among the charged offenses.
>
>"Do not conclude from this evidence that the defendant has a bad
>character or is disposed to commit crime.
>
>"*If you conclude that the defendant committed one of the charged
>offenses, that conclusion is* only one factor to consider along with all
>the other evidence.  It is *not sufficient by itself to prove that the*

92

*defendant is guilty of the other charged crimes and allegations. The People must still prove each charge and allegation beyond a reasonable doubt*." (Italics added.)

b. *Evidence Code section 1101*

Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Thus, evidence of other crimes or bad acts is inadmissible when it is offered to show a defendant had the criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a).)

Subdivision (b) of Evidence Code section 1101 "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt*, *supra*, 7 Cal.4th at p. 393, fn. omitted.) Specifically, that subdivision provides that nothing in that section "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

c. *Analysis*

Moreno's contentions are primarily premised on her assertion the giving of the modified version of CALCRlM No. 375 to the jury without an objection by Resnick requires reversal of the judgment because the instruction "created ambiguity about the burden of proof" such that if the jury "establish[ed] beyond a reasonable doubt that [she]

93

aided and abetted the [Tostado] kidnapping" charged in count 2, the jury could decide "the other two [kidnappings charged in counts 3 and 4] upon some unknown burden of proof." This assertion is without merit.

As pertinent here, the modified instruction told the jurors that if they decided the prosecution had proved beyond a reasonable doubt Moreno was a principal in the commission of one or more of the three charged kidnappings, they could consider but were not required to consider her commission of that kidnapping or those kidnappings for the purpose of deciding whether she "committed the other offenses" charged in this case.

The instruction also told the jurors, however, that if they concluded Moreno had committed one of the charged kidnappings, such a conclusion "was not sufficient by itself to prove that [she was] guilty of the other charged offenses beyond a reasonable doubt" because "[t]he People must still prove each charge and allegation beyond a reasonable doubt."

In addition, the instruction cautioned the jury against using the evidence as propensity evidence: "Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."

The jury was separately instructed under CALCRlM No. 3515 (Multiple Counts: Separate Offenses ([§ 954])) that "[e]ach of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." The jury was also instructed under CALCRlM No. 220 (Reasonable Doubt) that "[a] defendant in a criminal case is presumed to be innocent," and this presumption of innocence "requires that the People prove a defendant guilty beyond a reasonable doubt."

94

We presume the jurors understood and followed the court's instructions (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9), and there is nothing in the record to rebut this presumption. On the contrary, the record shows the jury did not base its verdicts simply on Moreno's prior or subsequent conduct because it found her not guilty of the kidnapping for ransom charged in count 3. We conclude Moreno's claims of ineffective assistance of counsel and constitutional error are meritless.

8. *Resnick's failure to object on hearsay grounds to Pena's testimony about Estrada-Gonzalez's postarrest statements to Pena regarding a payment to "Nancy"*

Moreno next contends Resnick provided ineffective assistance of counsel by failing to object to Pena's testimony about a conversation he had with Estrada-Gonzalez, while both were in custody, concerning a payment Estrada-Gonzalez made to "Nancy." Moreno asserts Pena's testimony about Estrada-Gonzalez's statements was "hearsay without an exception," and "[t]here could be no tactical reason for Attorney Resnick to fail to jump up and object." We reject this contention.

a. *Background*

During redirect examination, without an objection by Resnick, Pena testified that while he and Estrada-Gonzalez were in a holding cell waiting for court, Estrada-Gonzalez told Pena (1) he gave "Nancy" $15,000 in a hotel; (2) he gave her the money on June 16, 2007, after a ransom payment had been made; and (3) the money was exchanged before Estrada-Gonzalez was arrested by the FBI.

95

b. *Analysis*

"Whether to object to inadmissible evidence is a tactical decision[, and,] because trial counsel's tactical decisions are accorded substantial deference, failure to object seldom establishes counsel's incompetence." (*People v. Hayes* (1990) 52 Cal.3d 577, 621.)

Here, Resnick's decision not to object to Pena's foregoing testimony was a reasonable tactical decision this court will not second-guess. (*People v. Hayes*, supra, 52 Cal.3d at p. 621.) Instead of raising hearsay objections to the testimony Moreno challenges on appeal, Resnick reasonably chose to cross-examine Pena in an attempt to attack his credibility and show the "Nancy" in question was someone other than Moreno. Resnick elicited from Pena that he was arrested in June 2007 and charged with (among other things) the kidnapping for ransom of Tostado with an injury allegation. Pena acknowledged the penalty for this offense was life in prison without the possibility of parole. Pena also acknowledged he ultimately cooperated with the prosecution more than two-and-a-half years after he was arrested in exchange for a lesser sentence. He further acknowledged he was testifying in this case to earn that lesser sentence.

Resnick also focused on the fact that Pena had made inconsistent statements. She also questioned Pena about several women in an apparent attempt to suggest to the jury that one of them was the lure during the kidnappings and was using Moreno's identity to commit the crimes.

Furthermore, the testimony Moreno now challenges did not go to the central identification issue of whether the Nancy that Estrada-Gonzalez paid and Moreno were the same person.

For these reasons, we conclude Resnick's decision not to assert the hearsay objections Moreno claims Resnick should have made was a reasonable tactical decision we will not second-guess. (*People v. Hayes*, *supra*, 52 Cal.3d at p. 621.)

9. *Ineffective-assistance-of-counsel and two related claims regarding Moreno's desire for new appointed counsel and her right to testify on her own behalf*

In her next claim, which appears to encompass multiple contentions, Moreno asserts her "Sixth Amendment right to loyal and competent assistance of counsel was violated when her attorney [(Resnick)] failed to present [Moreno's] letter to the trial judge requesting a *Marsden*[17] hearing which ultimately resulted in the denial of her fundamental right to testify on her own behalf." We construe this claim as raising contentions that (1) Resnick abandoned the duty of loyalty she owed to Moreno, thereby requiring a new trial, because Resnick did not believe in her innocence; (2) Resnick provided ineffective assistance of counsel by failing to request a *Marsden* hearing on Moreno's behalf, thereby requiring remand for such a hearing; and (3) Resnick provided ineffective assistance of counsel by not permitting Moreno to testify on her own behalf, thereby requiring reversal of the judgment. These contentions are unavailing.

---

17    *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

a. *Background*

Represented by Comeau, Moreno filed a "Motion to Set Aside Verdicts Based on Denial of Sixth Amendment Right to Counsel."  Comeau stated in the motion that she was seeking "redress for the violation of [Moreno's] Sixth Amendment right to loyal and competent assistance of counsel and other fundamental violations."  The motion raised four complaints about Resnick:  (1) she allegedly told Moreno she believed Moreno was guilty, and she did not listen to Moreno's protestations of innocence; (2) Resnick did not adequately advise Moreno during the plea bargaining process; (3) Resnick "refused" to advise the court that Moreno wanted a *Marsden* hearing; and (4) Resnick "denied" Moreno the right to testify on her own behalf.

Attached to the motion was a declaration by Comeau with a copy of a typewritten letter that was an English translation of a letter dated July 29, 2011 (July 29 letter) in which Moreno told Resnick she was dissatisfied with Resnick's services and was asking Resnick to bring the matter to the attention of the trial judge, Judge Einhorn.  Comeau also submitted a copy of the Spanish version of Moreno's letter that was signed by Moreno.

Included in the motion was a declaration in English signed by Moreno.  Moreno detailed her conversations with Resnick about the Tostado kidnapping and complained about some of the questions Resnick asked her regarding that crime.  Moreno indicated they argued because she told Resnick that Estrada-Gonzalez was nothing but a good friend and boyfriend, and Resnick responded that she did not believe her.  Moreno also said she and Resnick had many arguments and, after one of them, Resnick e-mailed her a

98

written apology. Moreno indicated she gave Resnick the July 29 letter asking for a new attorney but Resnick said she would not show it to Judge Einhorn because it would "look really bad" for Moreno to ask for a new lawyer and it would affect the process of her case. Moreno stated in her declaration that she believed she had to follow Resnick's advice because Resnick was her attorney. However, she later told Resnick she was going to tell the judge she wanted a new lawyer.

Resnick told her the prosecution wanted her cooperation and was offering her 15 years in prison instead of life in prison. Resnick told her it might be best to get a better outcome. Moreno indicated Resnick's investigator encouraged her to go to trial. Moreno stated that when Resnick met with Moreno to discuss whether she should testify, Resnick "ma[d]e a 'face' that indicated her disrespect of [Moreno] as a person" and indicated she thought Moreno was being untruthful when Moreno said she could not remember details about the case. Resnick expressed frustration and advised Moreno not to testify because everything Moreno was saying would look bad and would hurt her case.

In its written opposition to Moreno's motion to set aside the verdicts, the prosecutor argued Moreno's claims amounted to a renewed attack on Resnick's representation, an issue that already had been litigated in Moreno's new trial motion. The prosecution urged the court to summarily deny the motion, but requested that the People be allowed to call Resnick as a witness to rebut Moreno's assertions if the court was inclined to entertain the motion on its merits. The prosecution advised the court that because of confidentiality concerns, Resnick had declined to provide a declaration regarding Moreno's allegations.

99

The trial court issued a tentative order denying the motion. Moreno responded by submitting a written "Proffered Trial Testimony of Defendant Nancy Mendoza" in which she told the court she would have testified she had never seen Vasquez before the preliminary hearing; when Vasquez was abducted, she was at school and was working part time; she did not own a car and was not licensed to drive one; she had never been to a gym in the United States; Pena was a liar; she was not the woman Valencia introduced to Tostado; she had never been to a Starbucks in the United States; before she was arrested she had only seen Tostado depicted on billboards as one of the most wanted individuals in Mexico; she knew nothing about guns, gangs, kidnappings, or the "sinister plans" of Rojas and Estrada-Gonzalez; and although she was Estrada-Gonzalez's girlfriend, she was never told by him or anyone else that he was involved in kidnappings and murders.

Comeau also filed on Moreno's behalf a written reply to the prosecution's opposition. Moreno claimed an evidentiary hearing was required to preserve her right to petition for habeas relief in the federal court. She provided a long list of additional complaints against Resnick and argued Resnick had been "embroiled in an irreconcilable conflict" with her because Resnick was "sympathetic to the prosecution's position," which "created a conflict of interest." Moreno believed that because of that conflict, she was entitled to a new trial without a showing of prejudice. Moreno asserted she had a right to testify in her own defense, and Resnick "unilaterally foreclosed on this fundamental right."

100

The trial issued a written order confirming its tentative ruling and denying Moreno's motion to set aside the verdicts. The court stated it had evaluated Moreno's claims under the standards set forth in *Strickland, supra,* 466 U.S. 668, and *Ledesma, supra,* 43 Cal.3d 171. With regard to her conflict-of-interest alegation, the court explained that an attorney did not need to believe in a client's innocence in order to effectively represent her. Thus, even if proven, this allegation, standing alone, did not entitle Moreno to relief.

The court explained that although an attorney is required to vigorously represent, Resnick's alleged "dismissive attitude" did not necessarily show deficient performance or prejudice to Moreno's case. The court found the record did not support Moreno's allegations that Resnick "nudged her to fudge on the details" or "pushed" her to settle the case. The court also found the plea bargain offered to Moreno was a viable alternative based on the evidence, Moreno rejected it, and Resnick vigorously litigated the case at trial.

Regarding Moreno's claim she requested a new attorney, the court explained that not believing in a client's innocence and disagreements about trial tactics would not be sufficient bases for granting a *Marsden* motion, had one been made. The court found Resnick investigated and presented a misidentification defense that Moreno was not the woman who lured the victims to their kidnappers. The court stated that "[t]his coincide[d] with [Moreno's] declaration of innocence, regardless of whether [Resnick] believed it or not." Thus, Moreno had failed to show the court would have permitted her to obtain new counsel or that the defense would have been different such that she would

101

have received a more favorable outcome at trial. With respect to the plea bargaining process, the court found that Moreno's declaration did not support her claim that Resnick asked her to lie; Resnick merely told her to say nothing and she heeded that advice, and she advised Moreno to consider a plea bargain because it would be better than spending the rest of her life in prison.

Finally, concerning Resnick's alleged "refusal" to allow appellant to testify, the court found that Moreno's declaration indicated only that Resnick advised her not to testify. Resnick's advice appeared to be sound given Moreno's statements in her declaration indicating she could not remember details about this case. The court further found that even if Resnick prevented Moreno from testifying, Moreno had not shown how her testimony would have made a difference at trial, given the misidentification evidence already presented to the jury.

b. *Analysis*

i. *Duty of loyalty*

Moreno first contends Resnick abandoned the duty of loyalty she owed to Moreno, thereby requiring a new trial, because Resnick did not believe in her innocence; Specifically, she asserts Resnick "did not believe in her client despite the fact that her client never wavered in maintaining her innocence," and "[t]his is a clear breach of the duty of loyalty that is required of every attorney."

Moreno's contention is unavailing. She has cited no authority, and we are aware of none, that supports her novel suggestion that defense counsel must believe everything her client says. As the court noted in denying Moreno's motion to set aside the verdicts,

Resnick presented a misidentification defense that Moreno was not the woman who lured the victims to their kidnappers. The court properly found "[t]his coincide[d] with [Moreno's] declaration of innocence, regardless of whether [Resnick] believed it or not." Through her vigorous cross-examination of the prosecution's witnesses, her presentation of the testimony of the alibi and expert witnesses during the defense's case-in-chief, and her closing arguments, Resnick attempted to persuade the jury that the wrong person was on trial. Resnick was partially successful as shown by the fact that the jury found Moreno not guilty of the kidnapping for ransom charged in count 3.

ii. *Marsden*

We reject Moreno's next contention that Resnick provided ineffective assistance of counsel by failing to request a *Marsden* hearing on Moreno's behalf. "Tactical disagreements between the defendant and [her] attorney do not by themselves constitute an 'irreconcilable conflict.'" (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.) Furthermore, "'the way in which one relates with his attorney[] does not sufficiently establish incompetence.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1192.)

Furthermore, Moreno has failed to show the court would have granted her *Marsden* motion had she brought such a motion or if Resnick had given Moreno's July 29 letter to the court. In its order denying Moreno's motion to set aside the verdicts, the court indicated it would not have granted a *Marsden* motion had Moreno brought such a the motion.

In addition, Moreno stated in her declaration in support of her motion to set aside the verdicts that she told Resnick she was going to tell the judge she wanted a new

103

lawyer. This shows Moreno understood she had the right and ability to bring her own *Marsden* motion for appointment of new counsel. Moreno does not adequately explain why she did not do so. Instead, she attempts to blame Resnick in an unavailing effort to obtain a new trial.

iii. *Right to testify*

Moreno also contends Resnick provided ineffective assistance of counsel by not permitting her to testify on her own behalf. This contention is unavailing.

"[T]he decision to place a defendant on the stand is ordinarily within the competence and purview of trial counsel, but . . . a defendant who insists on testifying may not be deprived of doing so even though counsel objects." (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231.) However, "[w]hile the defendant has the right to testify over his attorney's objection, such right is subject to one significant condition: The defendant must timely and adequately assert his right to testify." (*Ibid.*) "When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.'" (*People v. Alcala* (1992) 4 Cal.4th 742, 805-806.) In the absence of a timely assertion of a desire to testify, the defendant is bound by the attorney's decision "and must seek relief, if any is due, by showing ineffective assistance of counsel." (*Hayes*, at p. 1232.)

Here, Moreno has failed to show that Resnick's performance fell below an objective standard of reasonableness under prevailing professional norms or that she (Moreno) would have obtained a more favorable outcome had Resnick advised her to

104

testify. Moreno's declaration in support of her motion to set aside the verdicts shows Resnick decided Moreno should not testify after Moreno failed to answer questions about the case. As shown by the summary of the defense evidence presented at trial set forth in the factual background, *ante*, testimony similar to the testimony Moreno claims she would have given was given by the defense alibi witnesses that Resnick called to the stand.

10. *Appellate counsel Comeau's own alleged ineffective assistance of counsel at sentencing for failing to ask the court to strike the section 209(a) bodily harm enhancement*

The record shows Moreno retained Comeau to represented her during sentencing. Comeau is Moreno's new appellate counsel in this case.

Comeau asserts this court should strike the section 209(a) bodily harm enhancement accompanying count 2 (kidnapping for ransom of Tostado) because Moreno received ineffective assistance of counsel at sentencing in that Comeau failed to ask the court to exercise its discretion under section 1385 to strike the bodily harm allegation. Comeau labels herself "wholly incompetent in this respect" and states "there was no tactical reason" for her "fail[ure] to invite the trial court to strike the [section] 209(a) bodily harm enhancement on the grounds that [imposing an LWOP sentence] was disproportionate under the principles of [*Dillon*, *supra*, 34 Cal.3d 441]," Thus, Comeau claims that had she brought such a motion, the court would have concluded an LWOP sentence was cruel and unusual punishment, and it would have dismissed the allegation in the interests of justice and granted Moreno the possibility of parole.

105

The Attorney General acknowledges there are "no published California cases directly addressing a situation where trial or post-trial counsel also represents the defendant on appeal, and claims he or she was ineffective in the court below." However, the Attorney General asserts this court should decline to entertain this claim on the merits because Comeau "has created an inherent conflict of interest."

We need not resolve this ethical issue. Moreno and Comeau's claim is unavailing because we have already concluded the imposition of the LWOP sentence mandated by section 209(a) is not grossly disproportionate to her culpability and does not violate the prohibition of cruel and unusual punishment in the federal and California Constitutions. Thus, even if we were to assume Comeau provided ineffective assistance by failing to ask the court to dismiss the count 2 bodily harm enhancement allegation, Moreno has not shown, and cannot demonstrate, she was prejudiced by any such ineffective assistance of counsel.

## VI. *CALCRIM NO. 315* (*TWO CLAIMS*: *INSTRUCTIONAL ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL*)

In her supplemental letter brief filed May 12, 2015 (supplemental letter brief), Moreno contends the court prejudicially violated her federal constitutional right to due process by instructing the jury under CALCRIM No. 315 (Eyewitness Identification)—when evaluating eyewitness identifications—to consider (among other factors), "How certain was the witness when he or she made an identification?" Moreno also contends Resnick's failure to challenge this portion of CALCRIM No. 315 "rendered

106

her assistance of counsel ineffective."[18] Moreno's contention is unavailing because the instruction did nothing more than properly list factors for the jury's consideration.

A. *Background*

The jury was given a broad instruction under CALCRIM No. 315, which (as Moreno points out) advises jurors on how to evaluate eyewitness identifications. The instruction stated, "You have heard eyewitness testimony identifying [Moreno]." The instruction then told the jury, "[Y]ou must decide whether an eyewitness gave truthful and accurate testimony." The instruction then directed the jury to "consider" 16 "questions" (factors), including the one she challenges here: "How certain was the witness when he or she made an identification?"

B. *Analysis*

Moreno asserts that instructing the jury under CALCRIM No. 315 to consider the challenged factor—"How certain was the witness when he or she made an identification?"—erroneously "ratified the common misperception that a witness's certainty correlates with his or her accuracy." She states that, "[i]n fact, abundant scientific research over the last few decades has documented the unreliability of eyewitness identification, noting particularly that a witness's perceived sense of certainty about his or her identification is not a good indicator of the identification accuracy."

---

18    By asserting this claim in her supplemental letter brief without a separate heading or subheading summarizing this point, Comeau again fails to comply with rule 8.204(a)(1)(B), which (as discussed, *ante*) provides that "[e]ach brief must . . . [*s*]*tate each point under a separate heading or subheading summarizing the point*, and support each point by argument and, if possible, by citation of authority." (Italics added.)

Contrary to Moreno's suggestion, the court's instruction under CALCRIM No. 315 did not tell the jury that the more certain an eyewitness witness was, the more weight the jury was required to give to the witness's testimony. The instruction merely directed the jury to "consider"—as one of 16 factors—how certain the witness was when he or she made the identification in question. The weight to be given was left to each juror to decide. We conclude the court did not commit instructional error, and Resnick did not provide ineffective assistance of counsel by failing to object to the portion of CALCRIM No. 315 Moreno challenges.

## VII. *CALCRIM NO. 373*

Moreno also contends in the supplemental letter brief prepared by Comeau that the court committed instructional error "of constitutional dimension" instructing the jury under CALCRIM No. 373 (Other Perpetrator). Specifically, she contends the court's instruction under CALCRIM No. 373 was "prejudicial to [her] case, since it implied that [she] . . . was involved in the crime[s]." This contention is without merit.

A. *Background*

The court instructed the jury under CALCRIM No. 373, a standard instruction, as follows:

> "The evidence shows that other persons may have been involved in the commission of the crime[s] *charged* against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether those other persons have been or will be prosecuted. *Your duty is to decide whether the defendant on trial here committed the crimes charged*." (Italics added.)

108

B. *Analysis*

Moreno contends the court erred in giving CALCRIM No. 373 because the first sentence of that instruction—"[t]he evidence shows that other persons may have been involved in the commission of the crimes charged against the defendant"—was ambiguous and implied she "*was involved* in the crime[s], and at least one other person may also have been involved in the crime[s]" (italics added). She maintains this implication "impinged upon the presumption of innocence and the prosecution's burden to prove every element of the charged offense beyond a reasonable doubt."

The premise of Moreno's claim of instructional error—that the first sentence of CALCRIM No. 373 prejudicially implied she *was involved* in the kidnappings of Vasquez and Tostado—is not supported by the language of CALCRIM No. 373. The first sentence of that instruction unambiguously informed the jury that Moreno was only "charged" with certain crimes. It did not tell the jurors expressly or impliedly that she committed them. Moreno and Comeau disregard the last sentence of CALCRIM No. 373, which plainly and unambiguously informed the jurors that "[their] duty [was] to decide whether the defendant on trial here committed the crime[s] charged." Moreno's claim of instructional error is without merit and borders on being frivolous.

## VIII. *COURT'S FAILURE TO GIVE A UNANIMITY INSTRUCTION*

Moreno also contends in the supplemental letter brief that the court had a sua sponte duty "to give a unanimity instruction because the prosecutor presented evidence of multiple acts to prove each count of kidnaping and/or conspiracy." She asserts "there [was] plausible evidence there was more than one female involved in the abductions of

109

both [Vasquez] and [Tostado]."  Moreno further asserts "[t]he jury should have been instructed to find unanimously that [she] was the girl that [Vasquez] met at the 24 Hour Fitness," and "[t]he jury should have also been instructed to find unanimously that [she] was the girl that [Tostado] met at the Starbucks and the girl that he followed in the Equinox or Jeep to [the] Point Dume [Court residence] and that opened the door [there]."

We conclude Moreno's contention is without merit because the unanimity requirement is not applicable.  The California Supreme Court has explained that, "[i]n a criminal case, a jury verdict must be unanimous," and "[a]dditionally, the jury must agree unanimously the defendant is guilty of a *specific crime*."  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*), second italics added.)  "This requirement of unanimity as to the *criminal act* 'is intended to eliminate the danger that the defendant will be convicted even though there is no single *offense* which all the jurors agree the defendant committed.'"  (*Ibid*., italics added, quoting *People v. Sutherland* (1993) 17 Cal.App.4th 602, 612.)  *Russo* further explained that the unanimity requirement pertains to crimes, as shown by the purpose of that requirement:

> "The key to deciding whether to give the unanimity instruction lies in considering its purpose.  The jury must agree on a '*particular crime*' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another.  But *unanimity as to exactly how the crime was committed is not required*.  Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.]  *In deciding whether to give the instruction, the trial court must ask whether* (1) *there is a risk the jury may divide on two discrete crimes and not agree on any particular crime*, or (2) the evidence merely presents the possibility

110

the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo*, *supra*, 25 Cal.4th at pp. 1134-1135, italics added.)

Here, the unanimity requirement did not apply because this case plainly was not a case in which the prosecutor asked the jury to select one of two or more discrete criminal acts or events allegedly committed by Moreno in order to convict her of any single charged offense. Moreno does not contend this was such a case. Instead, she erroneously contends a unanimity instruction was required because some jurors may have thought Vasquez, Tostado, or both, interacted with another female around the time the crimes were committed. There simply was no risk the jury could have "divide[d] on . . . discrete crimes and not agree[d] on any particular crime" (*Russo*, *supra*, 25 Cal.4th at p. 1135). "[U]nanimity as to exactly how the crime was committed is not required." (*Ibid*.) Moreno's claim of instructional is without merit.

## IX. *CUMULATIVE ERROR*

Moreno also contends that "[n]ot only did each error individually prejudice [her], but the synergistic effect of the errors deprived [her] of her fundamental right to due process and fundamental right to a fair trial."

We reject this contention because "[w]e have found no error that, either alone or in conjunction with others, prejudiced [her]." (*People v. Williams* (2013) 56 Cal.4th 165, 201.) Moreno "was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

111

## X. *CLERICAL ERROR* (*ABSTRACT OF JUDGMENT*)

Last, Moreno argues, and the Attorney General agrees, the abstract of judgment incorrectly indicates (at p. 2) that the court at the sentencing hearing (August 23, 2013) ordered her to pay a parole revocation restitution fine under section 1202.45 in the amount of $600. The reporter's transcript of the sentencing hearing shows the court imposed no such fine because it sentenced Moreno to life in prison without the possibility of parole. Accordingly, the matter must be remanded with directions that the abstract of judgment be corrected to reflect the court did not impose a parole revocation restitution fine under section 1202.45.

## DISPOSITION

The judgment is affirmed. The matter is remanded with directions that the superior court prepare an amended abstract of judgment to reflect that the court did not impose a parole revocation restitution fine under section 1202.45, and to forward a certified copy of the corrected abstract to the Department of Corrections and Rehabilitation.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.

112